UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MANUEL GARCIA,<br><br>                              Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary<br><br>                              Respondent. | Case No.:  3:16-cv-00911-H-PCL<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE:**<br><br>**PETITION FOR WRIT OF HABEAS CORPUS** |

## I. INTRODUCTION

Petitioner Jose Manuel Garcia ("Petitioner"), before the Court pro se, filed a petition for writ of habeas corpus on April 14, 2016. (Doc. 1.) Petitioner presents ten arguments in support of his petition: (1) Petitioner's convictions are based on insufficient evidence; (2) the California Court of Appeal based its decision on Petitioner's jury bias argument on an unreasonable determination of the facts; (3) six jurors were particularly biased against Petitioner; (4) the trial court erred in not ordering a mistrial *sua sponte* following an external incident involving potential jury tampering; (5) Petitioner received ineffective assistance of counsel from his trial counsel; (6) Petitioner also received ineffective assistance of counsel from his appellate counsel; (7) Petitioner's sentencing

fine is unconstitutional[1]; (8) Petitioner's sentence is cruel and unusual, thereby violating his Eighth Amendment rights; (9) cumulative error warrants Petitioner's trial unfair; and (10) Petitioner was entrapped by Special Service Unit agent Steven Epperson. (Doc. 1 at 15-19.) Petitioner also requests an evidentiary hearing. (*Id.*)

The Honorable Marilyn L. Huff referred this matter to the undersigned Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). After a thorough review of the petition, answer, exhibits, state court records, and state court decisions, the Court recommends **<u>DENYING</u>** relief.

## II. BACKGROUND

The Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Summer v. Mata*, 449 U.S. 539, 550 (1981) (holding in part that findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness). Petitioner has not claimed these facts are inaccurate, and so this Court takes the following from the California Court of Appeal:

> On July 5, 2010, the victim in this case – Victoriano Ortiz, an inmate at [R.J.] Donovan – was walking in a prison yard with two allies, Geronimo Polina ("Blue") and Manuel Gonzalez ("Stomper"). Blue suddenly turned on Ortiz and attacked him. Numerous other inmates quickly joined the assault on Ortiz, while other inmates attacked Stomper. The prosecution's theory was that the attack was the outcome of a power struggle between two rival factions of the Mexican Mafia then competing for control of Donovan, one of which was led by Ortiz and his "mesa," and the other led by a mesa composed of [Petitioner] ("Crazy Joe"), Morones, and two others. The Mexican Mafia seeks to control prisons using mesas as a command system, which is in effect a governing council. Ordinarily, the chief of the mesa is a "shot-caller" or "key-holder," and he has two or three "helpers" to help run various aspects or areas of the prison. The shot-caller and his helpers

---

[1] The Court dismissed this particular claim following a motion to dismiss filed by Respondent, finding the claim was outside the Court's jurisdiction under 28 U.S.C. § 2254(a). (Doc. 28 at 14, citing *Bailey v. Hill*, 599 F.3d 976, 979, 982 (9th Cir. 2010).)

comprise the mesa. He derives his authority to run the prison from a "member" of the Mexican Mafia.

### A. The Principal Participants

Morones was an associate in the Mexican Mafia serving a life sentence at Donovan. His eventual ally, [Petitioner], is also an active Mexican Mafia associate. Ortiz testified at trial about the structure of the Mexican Mafia. At the bottom of the organization pyramid are "southsiders," all members of Hispanic street gangs in southern California. These gang members must remit "taxes" (a portion of the proceeds of their illegal activity) to the Mexican Mafia. The next higher level consists of "surenos" or "soldiers," gang members who have garnered authority and more respect than southsiders by working for the Mexican Mafia, collecting taxes or enforcing orders through violent attacks. Above the surenos are "associates," who have worked their way up and are close to "members" (also referred to as "carnals") of the Mexican Mafia. At the top of the pyramid are the carnals, who can order someone killed or assaulted (also called "giving the green light") if the target is not respecting the authority of the Mexican Mafia. Such an order must be followed by all persons within the structure. Orders to attack someone, when issued by the mesa operating under a carnal's authority to run a prison, must be treated with the same obedience.

Ortiz was an associate in the Mexican Mafia and was incarcerated at Donovan to serve time for an assault he committed on its behalf. Ortiz believed his authority to run Donovan derived from his association with and permission from Richard Buchanon.

### B. The Power Struggle for Control of Donovan and the Attack on Ortiz

Ortiz arrived at Donovan in March 2010 and almost immediately sent out word through "kites" and word of mouth that he was in charge of Donovan and whoever was in charge needed to step down or risk being assaulted. "Kites" are small handwritten notes by which messages are surreptitiously passed to other inmates within the prison (either between cells within a cell block or even between cell blocks) or to persons outside the prison. Ortiz also formed his mesa, which included Stomper (Ortiz's right-hand man), and inmate named "Pino," and Morones. At one point, Morones asked Ortiz for paperwork containing Ortiz's authority, but Buchanon had verbally authorized Ortiz to run Donovan.

Another group apparently disagreed with Ortiz's attempt to exert control, and Ortiz believed this group was trying to challenge his authority. This group included Morones, who had been in a dispute with Stomper, and Pablo Franco ("Casper"). That group began sending kites asserting its

authority to run Donovan, which those in the group believed was derived from another carnal, and included messages to Ortiz that Ortiz "had something coming."

When Ortiz noticed that southsiders were beginning to follow Morones's group, he tried to reassert his authority because there can only be one mesa running a prison. Ortiz's efforts to regain control including writing a kite to Morones asking to resolve the power struggle (an offer that did not bear fruit) and challenging Casper to a fight, which Casper declined. Ortiz interpreted Casper's response and acquiescing to Ortiz's authority, and he sent a kite to Casper indicating they both were now working under Buchanon's authority. Ortiz formed a new mesa, including Stomper, Blue and Isaac Balesteros ("Lazy"). For the next month, everything appeared calm with Ortiz in control.

However, in late June or early July, problems over control reemerged after Rude Espudo ("Crazy Boy"), a carnal, was temporarily incarcerated at Donovan. Espudo gave authority over Donovan to Morones, [Petitioner] (Morones's cellmate), and two other inmates (Casper and an inmate with the moniker "Oso"). Almost immediately, Garcia began yelling on the tier of their cell block that he had "authority" and threatened that Ortiz and Stomper had "something coming", which Ortiz understood to mean he was targeted for attack. Ortiz also saw kites written by [Petitioner] and Morones ordering Ortiz be "whacked" with "no exceptions."

Authorities had placed [Petitioner] in a cell that was surreptitiously wired, and, during this period, numerous recordings were made of conversations between Morones and Garcia, as well as of conversations they had with other inmates. Some of the recordings from July 2, 2010 (three days before the attack on Ortiz an Stomper) showed that Morones had already begun writing a kite to Lazy when [Petitioner] began contributing to the kite. [Petitioner] told Morones to ensure that the kite declare Espudo's direct orders had established the new mesa, and the new mesa was ordering both Lazy and Blue (members of Ortiz's inner circle) to whack Ortiz and Stomper "on this next yard with no exceptions." The next day, July 3, [Petitioner] and Morones discussed whether Ortiz was going to come out to the yard and that he had group yard, and [Petitioner] said, "[T]hat's a good thing, that way we can blast the fuck out of him."

When Ortiz went to walk in the prison yard on July 5, 2010, he knew he was risking his safety because there was a chance he would be assaulted. However, he believed he still had authorization to run Donovan and could not show fear, so he nevertheless went into the yard. As Ortiz was walking with two of his allies (Blue and Stomper), Blue suddenly turned on Ortiz and began punching and cutting at him. Other inmates joined in the attack on

Ortiz while yet another group of inmates attacked Stomper. Although correctional officers responded by ordering the inmates to get down, and thereafter by firing some shots when the inmates ignored the command, the attackers did not immediately cease but instead continued stabbing Ortiz and banging his head against a wall. Ortiz suffered head and other injuries from the attack.

(Lodgment 19, 4-8.)

Petitioner was charged and found guilty by a jury of four criminal acts: conspiracy to commit murder, California Penal Code §§ 182(a)(1), 187(a), attempted murder through a conspiracy or aiding and abetting theory, California Penal Code §§187(a), 664, solicitation of murder, California Penal Code § 653f(b), and assault with a deadly weapon on a prisoner, California Penal Code § 4501. (Lodgment 1, 75; Lodgment 12, 1667.) Gang allegations were also found true on all counts, California Penal Code § 186.22(b)(1). (*Id*.) on July 20, 2012, after denying a motion for new trial, the trial court sentenced Petitioner to an aggregate prison term of 25 years to life plus 19 years determinate. The trial court later entered judgment on July 23, 2012.

Petitioner filed his direct appeal in the California Court of Appeal on June 11, 2013, challenging the conviction on six grounds. (Lodgment 16 at i-iii.) This appeal alleged reversal of Petitioner's conviction was required for the following reasons: (1) the trial court erred in answering Jury Question No. 3 regarding the attempted murder jury instruction; (2) trial counsel was ineffective in allowing the trial court to answer Jury Question No. 3 in such an erroneous way; (3) the trial court erred in failing to instruct *sua sponte* on the lesser included offense of conspiracy to commit an assault with a deadly weapon; (4) the trial court erred in imposing Petitioner's sentence on conspiracy to commit murder; (5) the trial court erred in imposing Petitioner's sentence on counts three and four; and (6) the trial court erred in failing to stay Petitioner's sentence on attempted murder. (*Id*.)

The government agreed with Petitioner's arguments regarding his sentence, and submitted to claims four through six. (Lodgement 17 at 27-32.) The Court of Appeal took

notice of this agreement between Petitioner and the government, and accordingly ordered Petitioner's sentence be modified. (Lodgment 19 at 31-33.) While the Court of Appeal granted Petitioner's appeal on these three grounds, on February 19, 2014, the Court of Appeal rejected Petitioner's challenges to the validity of his conviction and affirmed the judgment with the modified sentence. (*Id*. at 32-33.) On remand, Petitioner was resentenced to an aggregate term of 25 years to life plus nine years determinate. (Doc. 8-11, Ex. J at 1.)

Following this decision, Petitioner then filed a petition for review with the California Supreme Court on March 24, 2014. (Lodgment 20.) Petitioner raised those claims he had previously raised in the Court of Appeal which had been unsuccessful. (*Id*. at i-ii.) The Supreme Court, on June 11, 2014, summarily denied the petition. (Lodgment 21.)

On December 29, 2014, Petitioner filed a petition for writ of habeas corpus in the California Superior Court. (Lodgment 22.) Herein, Petitioner raised eight arguments: (1) insufficiency of the evidence; (2) entrapment; (3) juror bias and misconduct; (4) ineffective assistance of trial counsel; (5) ineffective assistance of appellate counsel; (6) erroneous imposition of fines and fees; (7) cruel and unusual punishment; and (8) cumulative effect of error. (Id. at i-iv.) Petitioner also requested an evidentiary hearing based on these claims. (Id. at iv.) The Superior Court found Petitioner failed to make a prima facie showing on any of his claims and denied relief. (Lodgment 23 at 3-10.)

After the Superior Court's denial, Petitioner file da petition in the Court of Appeal alleging the same claims as in the Superior Court. (Lodgment 24 at i-iv.) The Court of Appeal held all Petitioner's claims in his petition were procedurally barred. (Lodgment 25 at 2.) Specifically, the Court of Appeal found "the claims [were] untimely because [Petitioner] waited more than two years after he was sentenced to assert them" and gave no justification for the delay. (*Id*.) The Court of Appeal also rejected all of the claims on the merits as well. (*Id*. at 2-5.)

On May 26, 2015, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising the same grounds as previously raised in his collateral attacks in the lower state courts. (Lodgment 26 at i-iv.) Additionally, Petitioner raised a final argument claiming "all of his state and federal constitutional guarantees" had been violated "by the state court's failure and refussal [*sic*] to grant habeas corpus relief." (*Id.* at iv.) On October 14, 2015, the Supreme Court summarily denied the habeas petition. (Lodgment 27.)

Finally, on April 14, 2016, Petitioner filed the present petition for writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254, challenging his state court conviction of July 23, 2012. (Doc. 1.) Petitioner rests his petition on the same grounds as he had previously raised in the state courts: (1) insufficiency of the evidence; (2) entrapment; (3) juror bias and misconduct; (4) ineffective assistance of trial counsel; (5) ineffective assistance of appellate counsel; (6) erroneous imposition of fines and fees; (7) cruel and unusual punishment; and (8) cumulative effect of error. (*Id.* at ii-vi.) Pursuant to a motion to dismiss filed by Respondent, the Court dismissed the sixth argument regarding the imposition of fines and fees. (Doc. 28 at 14.) The Court held it "lack[ed] jurisdiction over Petitioner's habeas claim challenging the trial court's imposition of fines and fees." (*Id.*) Accordingly, the claim was dismissed.

Respondent was ordered to answer Petitioner's petition, and Respondent did so on May 10, 2017. (Doc. 31.) At that time, Respondent also lodged the state court record in this Court. (Doc. 32.) While Petitioner's traverse was originally due no later than June 9, 2017, this Court granted two extensions, the latest of which extended Petitioner's deadline to November 9, 2017. (Docs. 34, 37.) On November 17, 2017, Petitioner submitted a copy of the Court's first order granting an extension and nine pages of medical records. (Doc. 38.) This submission was rejected as not complying with local rules. (*Id.*) To date, Petitioner has not filed any traverse to Respondent's answer. Thus, before this Court now are the remaining seven claims.

# III. SCOPE OF REVIEW

A federal court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of state court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see Park v. California*, 202 F.3d 1146, 1149-50 (9th Cir. 2000) ("a violation of state law standing alone is not cognizable in federal court on habeas").

This FAP is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. §2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinary deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877(9th Cir. 2004). Because Petitioner's arguments involve only questions of law, this Court reviews the petition under the "contrary to" and "unreasonable application" clauses of § 2254(d)(1).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant

relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of §2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

Where the state court did not reach the merits of a claim because of the imposition of a state procedural bar, "there is no state court decision. . . . to which to accord deference." *Pirtle*, 313 F.3d at 1167. Thus, this court must review those claims de novo. *Id.* However, AEDPA "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S 86, 100 (2011). "Rather, [as the Supreme Court has] explained, '[w]hen a federal claim

9

has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) (quoting *Richter*, 562 U.S. at 99).

## IV. DISCUSSION

In his petition, Petitioner raises seven arguments which he claims entitle him to habeas relief, or in the alternative, an evidentiary hearing. These grounds are as follows: (1) insufficiency of the evidence; (2) entrapment; (3) juror bias and misconduct; (4) ineffective assistance of trial counsel; (5) ineffective assistance of appellate counsel; (6) cruel and unusual punishment; and (7) cumulative effect of error. (Doc. 1 at ii-vi.) In response to this petition, Respondent first raises a timeliness defense wherein Respondent claims Petitioner has not filed the instant petition within the allotted time set out by AEDPA. (Doc. 31 at 12.) Respondent argues all of Petitioner's claims are procedurally defaulted due to this failure to comply with the timeliness doctrine. (*Id*. at 13.) Moreover, Respondent contends even if Petitioner's claims are not procedurally defaulted, each of Petitioner's claims is meritless. (*Id*. at 19-27.)

### *A. Timeliness under AEDPA*

In 1996, AEDPA created additional procedural requirements for a convicted defendant filing a federal petition for writ of habeas corpus. 28 U.S.C. § 2244. Among other things, AEDPA now requires a petitioner to file an application for writ of habeas corpus in a federal court within one year of an adverse judgment of a state court. 28 U.S.C. § 2244(d)(1). This period of limitation begins on "the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review; . . . ." 28 U.S.C. § 2244(d)(1)(A). However, when a "properly filed application" for collateral review of the judgment or claim is pending in the state court, this period of limitation will toll. 28 U.S.C. § 2244(d)(2).

In federal courts in California, as long as the petitioner was "properly pursuing" state court remedies, *i.e.* collateral review in the state courts, AEDPA's "statute of

limitations is tolled from the time the first state habeas petition is filed until the California Supreme Court rejects the petitioner's final collateral challenge." *Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999) (footnote omitted). However, if a state court finds the petition is untimely under state timing rules, this tolling will not apply, such that the time between filings in California courts will not count under the "pending" language of 2244(d)(2). *Evans v. Chavis*, 546 U.S. 189 (2006); *Carey v. Saffold*, 536 U.S. 214 (2002). But, "AEDPA's statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case 'pending' during that interval." *Nino*, 183 F.3d at 1006.

A pro se prisoner's pleading is deemed filed on the date of its submission to prison authorities for mailing to the court, as opposed to the date of its receipt by the court clerk. *Houston v. Lack*, 487 U.S. 266, 276 (1988). To benefit from this so-called prisoner mailbox rule, a prisoner must meet two requirements: (1) he must be proceeding without assistance of counsel, and (2) he must deliver his filing to prison authorities for forwarding to the court. *Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003).

In this case, Petitioner has proceeded *pro se* since his direct appeal was denied by the California Supreme Court. (*See, e.g.,* Lodgment 22.) Thus, the first element is met for Petitioner to avail himself of the prisoner mailbox rule. Additionally, Petitioner includes in all of his petitions submitted to the various courts a document entitled "PROOF OF SERVICE DECLARATION OF SERVICE BY U.S. MAIL." (*See*, *e.g.*, Doc. 1 at 102.) This document is provided for Petitioner to fill out a proof of service, and provides a blank line in which Petitioner is to write in the date when Petitioner "turned over to prison officials in a timely fashion" the specific document "for forwarding to the clerk of the court as well as to all parties." (*Id*.) This document is sufficient to show Petitioner delivered each of his filings to prison authorities in anticipation of the filings being forwarded to the respective courts. Therefore, Petitioner can appropriately use the prisoner mailbox rule, and the Court accordingly uses the dates indicated on the included

proof of service pages instead of the file stamp dates on Petitioner's petitions to calculate time pursuant to AEDPA.

Petitioner's request for review in the California Supreme Court during his direct appeal was denied on June 11, 2014. (Lodgment 27.) Petitioner then had 90 days to seek review in the United States Supreme Court. *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999). Under 28 U.S.C. §2244(d)(1)(A), therefore, Petitioner's conviction became final on September 10, 2014. Petitioner did not submit his petition for writ of habeas corpus to prison officials to then be filed in the state court until December 18, 2014. (Lodgment 29 at 75.) The time between these two events was 99 days – effectively meaning 99 days of Petitioner's one year period of limitation elapsed before Petitioner initiated his post-conviction relief proceedings.

From December 29, 2014 to May 26, 2015, Petitioner's petition went through the collateral attack process provided by the California courts. Specifically, Petitioner submitted his petition to prison officials to be filed in the Superior Court on December 18, 2014, and the petition was denied on January 14, 2015. (Doc. 22; Doc. 23.) Petitioner then filed his petition in the Court of Appeal on February 4, 2015, and the petition was also denied there on March 5, 2015. (Doc. 24; Doc. 25.) Finally, Petitioner filed his petition in the California Supreme Court on May 26, 2015, and the petition was denied on the docket on October 14, 2015. (Doc. 26; Doc. 27.) During this entire process, Petitioner's one year period of limitation was tolled according to 28 U.S.C. § 2244(d)(2), so long as Petitioner was "properly pursu[ing]" his claims. *Nino*, 183 F.3d at 1006.

Following this denial by the Supreme Court, Petitioner submitted the current petition to prison officials to be filed with this Court on April 7, 2016 – almost six months after the Supreme Court's denial. (Doc. 1.) The time between these two events was 176 days. These days are no longer tolled because the state collateral attack had been completed, and therefore the days must be counted against the one year period of limitation. Thus, Petitioner used 99 days of the period of limitation before he launched

his collateral attack at the state level, and 176 days after such an attack before launching a similar collateral attack at the federal level. Combined, therefore, Petitioner waited 265 days to file the current petition, which is within the one year period of limitation.

Respondent argues Petitioner's current petition is in fact untimely because the Court of Appeal rejected the petition initially based on its untimeliness.[2] Respondent claims the Court of Appeal's justification for the denial means the one year period of limitation should only be tolled for the pendency of Petitioner's petition filed in the Superior Court. (Doc. 31 at 12.) Respondent's argument is based on *Pace v. DeGuglielmo*, 544 U.S. 408 (2005), wherein the United States Supreme Court decided "whether a state postconviction petition rejected by the state court as untimely nonetheless is 'properly filed'" within the meaning of AEDPA's period of limitation. *Id.* at 410. The Court answered the issue negatively, thus holding that a state court's finding a petition untimely will render the petition improperly filed and not eligible for tolling of the AEDPA statute of limitation.

California does not have a definitive statute of limitations for criminal defendants mounting collateral attacks. Instead, California requires these attacks merely be launched "in a timely manner." *In re Reno*, 55 Cal.4th 428, 459 (2012). Moreover, "it has long been required that a petitioner explain and justify any significant delay in seeking habeas corpus relief." *In re Clark*, 5 Cal.4th 750, 765 (1993). Because of this uncertainty, California courts must determine whether petitions are presented without "substantial delay." *In re Reno*, 55 Cal. 4th at 460.

In Petitioner's case, the California Court of Appeal discussed the timeliness of Petitioner's petition in one sentence: "The claims are untimely because [Petitioner] waited more than two years after he was sentenced to assert them, but has offered no

---

[2] The Court of Appeal denied the petition based on untimeliness but ruled that even if timely the claims lacked merit. (Lodgment 25, at 2.)

13

explanation for the delay."[3] (Lodgment 25 at 2.) When a petition is rejected by a state court for being untimely, the petition, by definition, cannot be "properly filed" under § 2244(d)(2). *Pace*, 544 U.S. at 417. Therefore, because the Court of Appeal rejected Petitioner's petition as untimely, AEDPA's tolling statute no longer applied after the Superior Court issued its denial.

Accordingly, the time between the Court of Appeal's rejection and Petitioner filing the current petition before this Court must be counted against the one year period of limitation.[4] The time between the Superior Court's denial of Petitioner's petition on January 14, 2015, and Petitioner filing the current petition on April 7, 2016 is 499 days. This is very clearly in excess of the one year limit imposed by AEDPA. While this amount of time alone exceeds the period of limitation, Petitioner also waited 99 days after his conviction became final before mounting his initial collateral attack in the California Superior Court. Combined, Petitioner used 598 days, 233 days more than AEDPA's one year period of limitation allowed. Because Petitioner is not entitled to any tolling which would excuse the tardiness of his claims, Petitioner's federal petition is barred by the one year statute of limitation.

In Petitioner's opposition to Respondent's previously filed motion to dismiss, (Doc. 8-1), Petitioner set forth facts he believed to excuse any untimeliness in filing his petition. (Doc. 17 at 11.) Therein, Petitioner states because he is "in the dark of all

---

[3] Petitioner's claims included in his petitions for writ of habeas corpus filed in the state courts, and now this Court, are wholly different than those Petitioner presented during his direct appeal. (*See* Lodgment 16, 22, 24, 26; Doc. 1.) Given the differences in Petitioner's claims on appeal and collateral attack, Petitioner does not have any grounds to raise an equitable tolling argument. To raise such an argument, a petitioner must show (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way. *See, e.g.*, *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990). Here, Petitioner has not been pursuing his rights diligently because he had not previously raised any of the claims included in the collateral attack; instead, Petitioner waited two years to raise such claims. The Court of Appeal was therefore correct in classifying Petitioner's claims as untimely.

[4] The time between the Court of Appeal's rejection on March 5, 2015 and Petitioner's filing the current petition on April 7, 2016 is 399 days. This clearly exceeds the one year period of limitations. Therefore, even if the AEDPA statute was tolled for the pendency of the petition filed in the Court of Appeal, the one year statute would still be violated.

jurisprudence," he was forced to seek the assistance of an "inmate jailhouse lawyer." (*Id.* at 12.) However, during this relationship between Petitioner and the "inmate jailhouse lawyer," each of the men were moved from prison to prison – once to the same prison, and next to separate prisons. (*Id.* at 10.) Petitioner claims because he required this assistance, and the moving from prison to prison was out of Petitioner's control, Petitioner is entitled to equitable tolling of the AEDPA time limit. (*Id.* at 11, 13.)

The United States Supreme Court has held that equitable tolling is allowed "only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). In fact, only two situations have arisen where federal courts have routinely granted such equitable relief: where the claimant timely files a document containing a mistake, and when the claimant is induced or tricked by his adversary to allow the filing deadline to pass. *Id.* Courts are typically "less forgiving" in situations where the claimant simply failed to exercise due diligence in order to preserve his legal rights. *Id*, citing *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984).

Here, Petitioner's failure to comply with the AEDPA time limit does not fall within one of the two recognized situations where federal courts tend to grant equitable tolling. Instead, Petitioner's failure falls squarely within the class of cases where these courts are "less forgiving," and typically refuse to grant equitable tolling. Petitioner's case does not present an extraordinary set of facts leading the Court to find equitable tolling warranted. Here, Petitioner did not timely pursue his post conviction relief in such a way that his efforts could be considered diligent. Petitioner blames the necessity of outsourcing his petition to an "inmate jailhouse lawyer" which caused significant delays in filing the petition. This blame is misplaced. Petitioner chose to undertake his own representation and proceed in this collateral attack pro se. While there are certain leniencies for pro se litigants, adhering to statutes of limitation is not one of them. *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir.), *cert. denied*, 133 L.Ed. 2d 69, 116 S.Ct 119 (1995) (although pro se pleadings are liberally construed, pro se litigants are nonetheless bound by procedural rules). *Cf. Whaleen/Hunt v. Early,* 233 F.3d 1146, 1148 (9th Cir.

2000) (en banc) (where the Ninth Circuit held a pro se Petitioner's inability to obtain information about the statute of limitation deadline may warrant equitable tolling).[5] Petitioner's rebuttal to the timeliness requirement for his petition fails; therefore, his petition must ultimately fail for tardiness. The petition is accordingly DENIED on this ground.

Although the Court is recommending the petition be denied due to failure to adhere to AEDPA's time limits, even if the petition was considered on the merits, Petitioner's substantive claims would also fail. These claims fail for the reasons set forth below.

## *B. Procedural Default*

In addition to being barred by AEDPA's time rule, Respondent argues Petitioner's claims also fail because they are procedurally defaulted. (Doc. 31-1 at 6.) Respondent first raised a procedural default argument in its motion to dismiss. (Doc. 8 at 3.) Petitioner refuted this claim, but alternatively argued there was sufficient cause and prejudice to excuse any potential procedural default. Petitioner argued because he is claiming ineffective assistance of both trial and appellate counsel compounded by Petitioner's complete lack of legal knowledge, therefore requiring him to seek assistance from a fellow inmate, create sufficient cause and prejudice to overcome a procedural default. (Doc. 27 at 13.)

The Court took this argument under submission, and found the timeliness rule (which the Court of Appeal based its denial of Petitioner's habeas petition) to be an independent and adequate state ground. (Doc. 28 at 9.) Additionally, the Court recognized as an independent and adequate state ground the Court of Appeal's denial of Petitioner's habeas claims, except for the ineffective assistance claims, because these claims could have been raised on direct appeal. (*Id*. at 9-10.)

---

[5] Here, Petitioner discussed and made an argument regarding AEDPA's filing time limit, so the case at hand is distinguishable from *Whalem/Hunt*. *See Regan v. State,* 2008 U.S. Dist. LEXIS 55966 (D. Haw. July 22, 2008).

In some cases, ineffective assistance can constitute cause in order to overcome a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). However, such a claim "generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards*, 529 U.S. at 542. Because Petitioner did not present either ineffective assistance claim during his direct appeal, the Court then turned to the narrow exception to the procedural default rule provided by *Martinez v. Ryan*, 566 U.S. 1 (2012) (*Martinez*), applicable specifically to ineffective assistance claims. This test states,

> To establish cause to overcome procedural default . . . , a petitioner must show: (1) the underlying ineffective assistance of trial counsel claim is substantial; (2) the petitioner was not represented or had ineffective counsel during the [post conviction relief] proceeding; (3) the state [post conviction relief] proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding.

*Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014) (quotations omitted). This test has been held by the Ninth Circuit to similarly apply to ineffective assistance claims regarding appellate counsel. *See Nguyen v. Curry*, 736 F.3d 1287, 1289 (9th Cir. 2013).

This Court then made its determination regarding Petitioner's claims and the effect of the alleged procedural default thereon:

> With respect to the first prong of the *Martinez* test, the prisoner must establish that the ineffective assistance of counsel claim is a substantial one, meaning that the petitioner "must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14; accord *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013). In the present habeas petition, Petitioner alleges that he received ineffective assistance of trial counsel because (1) trial counsel failed to investigate and introduce an entrapment defense; (2) trial counsel failed to introduce exculpatory audio recordings; (3) trial counsel failed to interview and subpoena an exculpatory government witness; (4) trial counsel failed to cross-examine Petitioner's wife; (5) trial counsel failed to hire a gang expert for the defense; (6) trial counsel committed serious misconduct; (7) trial counsel failed to move to strike several biased jurors for cause during voir dire; (8) trial counsel failed to move for a mistrial; and (9) trial counsel failed to challenge at sentencing Petitioner's consecutive sentence

and his restitution fine. (Doc. 1 at 59-61.) Petitioner further alleges that he received ineffective assistance of appellate counsel because his appellate counsel failed to raise on direct appeal his claims for: (1) insufficiency of the evidence; (2) ineffective assistance of trial counsel; (3) entrapment; (4) entrapment by estoppel and duress; (5) juror bias; (6) trial court's failure to declare a mistrial; (7) a *Brady* violation; (8) cruel and unusual punishment; (9) sentencing errors; (10) prosecutorial misconduct; (11) judicial misconduct; (12) violation of California Rules of Professional Conduct 38 and 5-110 by the prosecutor; and (13) cumulative effect of errors. (Id. at 63-64.)

Here, a determination of whether Petitioner's ineffective assistance of counsel claims are substantial will involve an evaluation of the merits of those claims. [Footnote omitted.] Further, the evaluation of the merits of Petitioner's IAC claims is intertwined with the merits of the other claims in the present petition. For example, Petitioner's claims that his trial counsel and appellate counsel were ineffective for failing to raise an entrapment defense at trial and on direct appeal, respectively, are intertwined with Petitioner's entrapment claim in the present petition. (See Doc. 1, at 59, 63, 73-81.) Accordingly, under these circumstances, the Court finds it appropriate to deny Respondent's motion to dismiss based on procedural default without prejudice to Respondent raising the procedural default defense to Petitioner's habeas claim in his answer. . . .

(Doc. 28 at 12-13.) The Court then ordered Respondent to file an answer to the petition for writ of habeas corpus. (*Id*. at 13.) In making such an order, this Court found Respondent's procedural default argument to be potentially meritorious. But, based on the *Martinez* exception and the interplay between the ineffective assistance claims and the other substantive claims in Petitioner's petition, the Court left all claims intact and denied Respondents' motion to dismiss. (*Id*.) The Court explicitly denied the procedural default argument without prejudice, thereby allowing Respondent to reassert the default again in its answer.

As a result, the Court now embarks to analyze the ineffective assistance claims, and the merits of the underlying claims therein. Inevitably, while discussing the underlying claims in Petitioner's ineffective assistance arguments, the analysis will concurrently be discussing Petitioner's original substantive claims included in his petition. Therefore, to discuss the petition as efficiently as possible, the Court will

temporarily side step the procedural default analysis of the substantive claims in favor of the discussing merits of Petitioner's ineffective assistance claims to determine whether under the Martinez test, any of Petitioner's ineffective assistance claims are "substantial," thereby defeating any procedural default. The Court will then return to any remaining substantive claims and determine whether such remaining claims are procedurally defaulted.

## *C. IAC of trial counsel*

Petitioner claims he received constitutionally ineffective assistance of counsel from his court appointed trial counsel in nine specific ways. First, trial counsel failed to present what Petitioner believes and argues was "the only true defense": entrapment. (Doc. 1 at 78, 92.) Second, trial counsel failed to move to strike seven jurors despite these jurors being allegedly biased for various reasons.[6] (*Id*. at 79, 80.) Third, trial counsel failed to motion for a mistrial after a man sat in the courtroom and spoke with a juror outside the courtroom, causing a "chilling effect" on at least three female jurors. (*Id*. at 79-80.) Fourth, trial counsel failed to challenge Petitioner's sentence as inaccurately applying sentencing rules when it was given. (*Id*. at 80.) Fifth, trial counsel failed to introduce an allegedly exculpatory audio recording which Petitioner argues exists. (*Id*. at 78.) Sixth, trial counsel did not interview or subpoena allegedly exculpatory government witnesses. (*Id*. at 78.) Seventh, trial counsel did not cross-examine Petitioner's wife.[7] (*Id*.) Eighth, trial counsel failed to retain a gang expert to refute the prosecution's gang expert, Epperson, who Petitioner believed was heavily biased against him. (*Id*.) Ninth and finally, trial counsel was accused by the prosecution of "serious misconduct," including

---

[6] Petitioner lists the factors which led him to the conclusion that seven of his 12 jurors and three alternate jurors were biased. These factors range from a juror having previously served on a jury in the same courtroom to jurors having extended family in various branches of law enforcement to a juror being disruptive during trial. (Doc. 1 at 39-65.)

[7] There is nothing in the record showing Petitioner's wife was ever directly examined. Presumably, Petitioner means to argue trial counsel failed to call Petitioner's wife as a witness and examine her accordingly.

intimidating potential witnesses and asking them to perjure themselves, and as a result, trial counsel prioritized her own defense over Petitioner's. (*Id.*)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) (stating it is beyond question that *Strickland* is the "clearly established" law governing ineffective assistance of counsel claims); *Baylor v. Estelle*, 94 F.3d 1321, 1323 (9th Cir. 1996) (same); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (same). There, the United States Supreme Court establish a two-part test for evaluating ineffective assistance of counsel claims. To establish that his trial counsel was ineffective under *Strickland*, a challenger must show: (1) his trial counsel's performance was deficient; and (2) trial counsel's deficient performance prejudiced his defense. *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 688, 694).

To establish deficient performance, Petitioner must show that "counsel made errors so serious . . . that counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. The relevant inquiry is not, however, what counsel could have done, but rather whether the decisions made by counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). In considering this factor, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. The Ninth Circuit "h[as] explained that '[r]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.'" *Ortiz*, 149 F.3d at 932 (quoting *Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995)). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review of highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365,

3:16-cv-00911-H-PCL

381 (1986). Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

It is well settled that "[c]onclusory allegations [of ineffective assistance of counsel] which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *see also Strickland*, 466 U.S. at 690 (a petitioner "making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment"); *Ortiz*, 149 F.3d at 933 (rejecting ineffective assistance of counsel claim where petitioner failed "to indicate how he was prejudiced by counsel's failure . . ." to conduct cross-examination on a specific issue); *United States v. Berry*, 814 F.2d 1406 (9th Cir. 1987) (defendant was not denied effective assistance of counsel for failure to call out-of-state witnesses absent indication of what witnesses would have testified to or how their testimony would have changed the outcome of proceeding.); *Cranford v. Sumner*, 672 F.Supp. 453, 457 (D. Nev. 1987) ("Aside from the bald allegation that his attorney should have raised this claim but did not, the petitioner has failed to demonstrate how his attorney's performance fell below the reasonable level of professional competence required by *Strickland*").

Also well-established is that a defendant has the ultimate authority to make fundamental decisions regarding whether to plead guilty, waive a jury trial, testify in his or her own behalf, or take an appeal. *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1 (1977) (Burger, C.J. concurring). However:

> [no decision of the Supreme Court] suggests, . . . the indigent defendant has
> a constitutional right to compel appointed counsel to press nonfrivolous
> points requested by the client, if counsel, as a matter of professional
> judgment, decides not to present those points.

3:16-cv-00911-H-PCL

*Jones v. Barnes*, 463 U.S. 745, 751 (1983). To require otherwise would "seriously undermine[] the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id*. The professional judgment and evaluation every defendant is entitled to is an examination of the record, research of the law, and the marshaling of arguments on behalf of the defendant. *Douglas v. California*, 372 U.S. 353, 358 (1963).

The Ninth Circuit has held that a convicted defendant has no Sixth Amendment rights on appeal because appellate review is not required of states. "If, however, the State elects to furnish an avenue for appeal, its procedures must comport with the Due Process and Equal Protections Clauses of the Fourteenth Amendment." *Tamalini v. Stewart*, 249 F.3d 895 (9th Cir. 2001).

In presenting this claim, Petitioner lists nine actions or inactions Petitioner deems deficient under *Strickland*. However, Petitioner does not present evidence or argue the second prong of the *Strickland* test requiring such deficient action to prejudice Petitioner's defense. Instead, Petitioner argues a per se presumption applies "because [trial counsel]'s errors involve[] an actual, or constructive denial of counsel during a critical stage of the proceedings, as well as because she failed to subject the government[']s case to adversarial testing." (Doc. 1 at 78, citations omitted.)

This argument rests specifically on *Cronic*, *Strickland*, *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991), and *Toomey v. Bunnel*, 898 F.2d 741 (9th Cir. 1990). (Doc. 1 at 78.) In citing to this ineffective assistance jurisprudence, Petitioner attempts to analogize his trial and trial counsel with their counterparts in these cases. If successful, Petitioner would be given the presumption of prejudice and be excused from proving this crucial second prong. However, Petitioner's attempt to do so is unsuccessful.

Each of these three cases involving the respective court noting a common reluctance to apply an exception created by *Cronic*, which "presumes prejudice where there has been an actual breakdown in the adversarial process at trial." *Toomey*, 898 F.2d at 744 n.2. In *Strickland*, the Supreme Court stated in dicta,

Attorney errors come in an infinite variety and are as likely to be utterly

harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.

*Id*. at 693. Because of this vast spectrum upon which an attorney's conduct may land, most often dictated by the circumstances of the case, "[e]ven if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." *Id*.

Beyond the quintessential examples of ineffective assistance of counsel which render a verdict unreliable, for example counsel sleeping through the trial or failing to prepare for the trial at all, there are other instances where the court will presume prejudice. The cases cited by Petitioner lay out these few specific instances. The first such instance is the complete denial of counsel. *Cronic*, 466 U.S. at 659. Additionally, when the prosecution's case is not properly subjected to "meaningful adversarial testing," the court will presume prejudice. *Id*. For example, if petitioner's counsel is "denied the right of effective cross-examination" because a court would not allow a crucial line of questioning to be pursued, the prosecution's case will not have been properly subjected to meaningful adversarial testing, and thus prejudice will be presumed. *See Davis v. Alaska*, 415 U.S. 308, 318 (1974); *see also Swanson*, 943 F.2d at 1074 (holding when an attorney informs the jury of his opinion that there is no reasonable doubt as to the only factual issues, the attorney has failed to subject the prosecution's case to meaningful adversarial testing). Additionally, if "counsel is burdened by a conflict of interest" such that counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance,'" the court will presume prejudice. *Strickland*, 466 U.S. at 692, citing *Cuyler v. Sullivan*, 446 U.S. at 350, 349. The extremity of the attorney's deficient act must be such that "there has been actual breakdown in the adversarial process at trial." *Toomey*, 898 F.2d at 722 n.2. To illustrate the level to which

the attorney's action or inaction must reach, the Ninth Circuit in *Toomey* noted that in a previous decision, it held an attorney's mental illness was not extreme enough to warrant the per se rule for prejudice to be applied. *See Smith v. Ylst*, 826 F.2d 872 (9th Cir. 1987), *cert. denied*, 488 U.S. 829 (1988).

Given these cases cited by Petitioner, there are seemingly three situations in which a court will presume prejudice and allow Petitioner to succeed on an ineffective assistance claim without showing the result of his trial could have been different but for his attorney's ineffective assistance. First, when there is a complete denial of counsel. *Cronic*, 466 U.S. at 659. Second, when counsel failed to subject the government's case to any "meaningful adversarial testing." *Id*. Third and finally, when counsel's representation of the petitioner was adversely affected by a conflict of interests which are being actively represented by counsel. *Strickland*, 466 U.S. at 692.

Petitioner's case does not fit into any of these three categories. Petitioner was provided counsel at his trial. During his trial, counsel zealously advocated for Petitioner, subjecting each government witness to lengthy and detailed cross-examination. Similarly, counsel presented a well prepared defense for Petitioner, based on Petitioner's claim of acting as a confidential informant or at least maintaining a status of a protected witness at the time of the criminal actions. Thus, Petitioner's counsel did in fact subject the prosecution's case to meaningful adversarial testing. Finally, there is no evidence to show Petitioner's trial counsel was engaged in a conflict of interest, let alone one which adversely affected counsel's performance in Petitioner's trial. In short, Petitioner was given access to a skilled defense attorney who fiercely advocated for him, and thus was properly represented at trial.

Because Petitioner's case does not fall into any of the enumerated circumstances where a court will presume prejudice, Petitioner is required to show prejudice resulted from his trial counsel's alleged deficient acts. *Strickland*, 466 U.S. at 691-92. Without a showing of prejudice, which is one of two required elements to prove ineffective

assistance of counsel, Petitioner's claim must fail. In addressing the prejudice prong of his ineffective assistance of counsel claim, Petitioner argues

> his appointed trial counsel's failure to fulfill her duty to represent [P]etitioner deprived him of a fair trial and effective assistance of counsel as guaranteed by the [6th and 14th amendments] and there is a reasonable probability that absent trial counsel's errors the fact finder would have had a reasonable doubt respecting his guilt.

(Doc. 1 at 80, emphasis omitted.) Petitioner continues to conclude, without any other explanation, that the facts of Petitioner's case fall squarely within those circumstances under which prejudice is to be presumed, as held in *Swanson* and *Cronic*. The Court has found Petitioner was not entitled to such a presumption. Because Petitioner fails to show any prejudiced resulted from the alleged nine instances of deficient performance, Petitioner's claim must fail. The Court will not discuss the deficiency of the actions alleged by Petitioner because no claim can survive Petitioner's failure to allege prejudice. *Strickland*, 466 U.S. at 691-92. Accordingly, Petitioner's claim of ineffective assistance of trial counsel is deemed not substantial under *Martinez*, does not overcome the procedural default, and is therefore DENIED.

## D. IAC of Appellate Counsel

Petitioner also claims he received ineffective assistance from his appellate counsel. (Doc. 1 at 82.) Specifically, Petitioner claims his appellate counsel failed to raise twelve claims which Petitioner believes are meritorious constitutional claims. (*Id.*) Petitioner alleges his appellate counsel was ineffective in failing to raise the following arguments in his direct appeal: (1) insufficient evidence; (2) ineffective assistance of trial counsel; (3) entrapment; (4) entrapment by estoppel or duress; (5) juror bias; (6) cruel and usual punishment; (7) the trial court erred in imposing Petitioner's sentence; (8) cumulative error; (9) the trial court failed to declare a mistrial based on potential jury tampering; (10) a Brady violation; (11) judicial misconduct; and (12) the prosecutor violated California Rule of Professional Conduct 38 and 5-110. (*Id.* at 82-83.)

Again, to prevail on this claim, Petitioner must not only satisfy the two pronged *Strickland* test, but must also satisfy the *Martinez* test, which begins with an inquiry as to whether the claims are "substantial" or not – meaning whether they have merit or not. Respondent argues Petitioner's claims of ineffective assistance of appellate counsel are not meritorious.[8] (Doc. 31-1 at 11-13.)

The Strickland standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." *Id*. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." *Id*. S*ee also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.") There is, of course, no obligation to raise meritless arguments on a client's behalf; likewise, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434. In order to demonstrate prejudice in this context, petitioner must show that, but for appellate counsel's errors, he probably would have prevailed on appeal. *Id*. at 1434 n.9.

Before filing the opening brief on appeal, Petitioner's appellate counsel sent Petitioner a letter in which counsel laid out "the potential issues on appeal." (Doc. 1 at 105.) Herein, appellate counsel listed a series of issues connected to the jury instructions

---

[8] Respondent also argues the Martinez test may not apply to appellate counsel at all according to an appeal of *Ha Van Nyugen v. Curry*, 736 F.3d 1287 (9th Cir. 2013), being appealed in the United States Supreme Court. (Doc. 31 at 14.) Because the test to determine whether a claim is "substantial" is the same as an actual determination of the claim on the merits, the Court does not address this aspect of Respondent's argument. Instead, the Court will simply determine whether the claims have merit or not.

which were given during Petitioner's trial and possible *Brady* issues. (*Id*. at 105-110.)
Additionally, appellate counsel informed Petitioner she had investigated duress,
entrapment, and entrapment by estoppel defenses and concluded none were meritorious.
(*Id*. at 110.) Finally, appellate counsel informed Petitioner she was still investigating
whether jury instructions regarding entrapment by estoppel or mistake of law or fact
should have been given. (*Id*.)

Petitioner responded to this letter and requested additional claims be made on
direct appeal. (*Id*. at 89.) These claims included: ineffective assistance of trial counsel for
failure to retain a rebuttal expert, failure to object to the change of venue, and failure to
subpoena potential exculpatory witnesses; entrapment; insufficient evidence; "outrageous
governmental misconduct" by Petitioner's handler; abuse of discretion by the trial court
in accepting the prosecution's gang expert, and alternatively, ineffective assistance for
failing to object to this expert witness; and "any meritorious grounds" remaining, such as
the eighth amendment, fourteenth amendment, and cumulative error. (*Id*. at 89-92.)
Additionally, in this letter, Petitioner urged his appellate counsel to discover an audio
recording wherein Petitioner "clearly say[s] 'Don't kill him! Just whack him a couple
times,'" which showed Petitioner did not use the word 'whack' to mean kill. (*Id*. at 93.)

Shortly after sending this letter, Petitioner received the opening brief which was
filed by appellate counsel on his behalf. The opening brief filed by appellate counsel
focused on six grounds: the trial court erred in clarifying the jury instruction for murder,
trial counsel rendered ineffective assistance in respect to this jury instruction, the trial
court erred in not instructing the jury on a lesser included defense, and three sentencing
errors. (Lodgment 16 at ii-iii.) No other grounds were included by appellate counsel in
Petitioner's direct appeal.

Petitioner responded to this with another letter to appellate counsel. (*Id*. at 94.)
Therein, Petitioner requests appellate counsel file a supplemental brief raising the *Brady*
issues appellate counsel noted in her initial letter, ineffective assistance of trial counsel
for not objecting to these alleged *Brady* issues, entrapment, a trial court error in not

instructing the jury regarding the entrapment defense, and insufficient evidence. (*Id.* at 95.) Despite Petitioner's request, appellate counsel did not file a supplemental brief. Instead, after the Court of Appeal rendered its opinion, granting in part and denying in part Petitioner's appeal, appellate counsel wrote Petitioner another letter. (Lodgment 19; Doc. 1 at 98.)

In this letter, appellate counsel explained to Petitioner what the Court of Appeal had effectively done to Petitioner's sentence; it had found the trial court had erred, and accordingly reduced Petitioner's sentence by 19 years. (Doc. 1 at 98.) Additionally, appellate counsel explained in great detail why she had concluded Petitioner's *Brady* claims were not meritorious and therefore had not included them in the brief. Appellate counsel cited case law and conducted an in depth analysis in presenting her conclusion to Petitioner. (*See* Doc. 1 at 99-103.) In this letter, appellate counsel also discussed why she had decided against raising the defense of entrapment by estoppel, again providing case law and analysis which led to her conclusion that the claim lacked merit. (*Id.* at 103-04.) Effectively, through these letters, appellate counsel provided her professional reasoning behind not presenting four of the five claims Petitioner requested be raised in a supplemental brief.

Thus, with respect to the first four claims raised by Petitioner in his second letter to appellate counsel, Petitioner has failed to demonstrate that his appellate counsel rendered ineffective assistance. Appellate counsel's decision to decline to present the issues suggested by petitioner and to instead press only issues on appeal she believed, in her professional judgment, had more merit than the issues suggested by petitioner was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759 (1970).

In the petition before this Court, Petitioner alleges his appellate counsel was ineffective for failing to raise, among other things, entrapment, entrapment by estoppel or duress, sentencing errors, and various *Brady* violations. (Doc. 1 at 82-83.) Based on the above analysis, appellate counsel was not deficient in failing to raise these particular

28

claims on appeal. Therefore, with respect to these four alleged deficiencies, Petitioner's claim of ineffective assistance of appellate counsel is without merit.

Furthermore, Petitioner also claims his appellate counsel was ineffective for failing to argue Petitioner received ineffective assistance of trial counsel. (*Id.* at 82.) Given, however Petitioner has not shown his trial counsel was ineffective and Petitioner has offered no additional evidence to this extent, Petitioner likewise has not shown his appellate counsel was ineffective for failing to make such a claim.

Because the remainder of the claims brought by Petitioner regarding the alleged ineffective assistance of appellate counsel are not addressed in either the correspondence between Petitioner and his appellate counsel or any other analysis herein, the Court will address the remaining claims separately. These remaining claims are that appellate counsel was constitutionally ineffective for failure to raise the following on appeal: (1) insufficient evidence, (2) juror bias, (3) cruel and unusual punishment, (4) cumulative error, (5) the trial court's error in failing to declare a mistrial following a man sitting in the courtroom and speaking with a juror, (6) prosecutorial misconduct, (7) judicial misconduct, and (8) the prosecution's violation of California Rule of Professional Conduct 38 and 5-110.

### 1. Insufficient evidence[9]

In his petition, Petitioner claims his convictions were based on insufficient evidence. (Doc. 1 at 36.) Petitioner makes a fairly simple argument: the prosecution did not show Petitioner had the specific intent to kill. (*Id.* at 38.) Instead, the prosecution's case was based on audio recordings from Petitioner's prison cell which included an excerpt in which Petitioner dictated a kite to his cellmate directing other inmates to

---

[9] Petitioner raises insufficiency of the evidence as its own separate claim in his petition before this Court. (Doc. 1 at 36.) While the Court analyzes the claim under the ineffective assistance of counsel heading, Petitioner's arguments will be taken from his petition, and the final conclusion on this claim will be effective as to both Petitioner's ineffective assistance claim and his substantive insufficient evidence claim.

"whack" Ortiz and Gonzalez "on the next yard." (*Id.* at 36.) Petitioner argues the lack of evidence showing the kite was in fact sent or that any inmate who participated in the actual assault of Ortiz had read the kite renders the verdict objectively unreasonable.

Petitioner raised this argument in his petitions for writ of habeas corpus filed in the Superior Court as well as the Court of Appeal. (*See* Lodgment 22, 24.) Each court, however, rejected the claim as barred under state law. Specifically, the Superior Court cited to *In re Lindley*, 29 Ca. 2d 709 723 (1947), which holds sufficiency of the evidence claims are not cognizable on habeas review. (Lodgment 22 at 10.) Likewise the Court of Appeal cited *In re Reno*, 55 Cal.4th 428, 459 (2012), which affirms the bar against insufficient evidence claims on habeas review. (Lodgment 24 at 2.)

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *accord Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Thus, a state prisoner who alleges the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). The prisoner, however, faces a "heavy burden" to prevail on such a claim. *Juan H.*, 408 F.3d at 1274, 1275 n.13. The question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

When determining the sufficiency of the evidence, a reviewing court makes no determination of the facts in the ordinary sense of resolving factual disputes. *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007), *vacated in part*, 503 F.3d 822 (9th Cir. 2007), *rev'd on other grounds*, 555 U.S. 179 (2009). Rather, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995); *see also Jackson*, 443 U.S. at 319, 324, 326.

In post-AEDPA cases, where, as here, a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" *Jackson*, a reviewing federal court applies an additional layer of deference. *Juan H.*, 408 F.3d at 1274. "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 565 U.S. 1 (2011) (*per curiam*); *see also Juan H.*, 408 F.3d at 1275 n.13. This "double dose of deference . . . can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *see also Coleman v. Johnson*, 566 U.S. 650 (2012) (*per curiam*) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference").

A state court's resolution of an insufficiency of evidence claim is evaluated under 28 U.S.C. § 2254(d)(1), not § 2254(d)(2). *Emery v. Clark*, 643 F.3d 1210, 1213-14 (9th Cir. 2011) ("When we undertake collateral review of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1) . . . we ask only whether the state court's decision was contrary to or reflected an unreasonable application of *Jackson* to the facts of a particular case"); *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) ("The pivotal question, then, is whether the California Court of Appeal . . . unreasonably applied *Jackson* in affirming Petitioner's conviction for second-degree murder"); *Boyer*, 659 F.3d at 965 ("[T]he state court's application of the *Jackson* standard must be 'objectively unreasonable' to warrant habeas relief for a state court prisoner"); *Juan H.*, 408 F.3d at 1275 ("[W]e must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case") (citing 28 U.S.C. § 2254(d)(1)).

In adjudicating an insufficiency of the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding

that sufficient evidence supported [the conviction]." *Juan H.*, 408 F.3d at 1278 n.14. In determining whether the evidence was sufficient, a federal court must follow the California courts' interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74 (2005).

Here, Petitioner argues the prosecution did not prove his specific intent to kill beyond a reasonable doubt, thus providing insufficient evidence to support Petitioner's convictions. (Doc. 1 at 38.) *See People v. Swain*, 12 Cal. 4th 593 (Cal. 1996) (conspiracy is a specific intent crime where the defendant must specifically intend to agree or conspire as well as intend to commit the objected offense). Instead, Petitioner argues the prosecution only showed there was a "mere 'fake' participation in the conspiracy and just an 'act' by an undercover C.I. for law enforcement[]." (Doc. 1 at 37.) Petitioner seems to claim that the prosecution failed to introduce evidence sufficient to overcome Petitioner's defense that he was a confidential informant feigning participation in the conspiracy, and therefore lacking any criminal intent. (Doc. 1 at 38, "[U]nder the circumstances of this case [and] the lack of evidence [of] the fact that Petitioner was an undercover C.I. expecting his release date so he [could] be relocated with his family to another state . . . , no rational trier of fact could have found the essential element of intent to kill beyond a reasonable doubt . . . .") Despite Petitioner's contentions, during trial, there was significant conflicting evidence introduced on this matter. While Petitioner, through his trial attorney, argued Petitioner's innocence as shown by his belief that he was to be transported out of state with his family upon the conclusion of his prison term for a parole violation, the prosecution introduced evidence to the contrary.

Specifically, the prosecution introduced evidence of Petitioner's past gang affiliations and conflicting evidence regarding Petitioner's status as a confidential informant. Although Petitioner claimed and argued he was a crucial witness for multiple currently uncharged cases, the prosecution introduced evidence which showed the contrary: Petitioner was not a confidential informant who helped law enforcement further their investigations. Additionally, and critically, the prosecution introduced a recording of

Petitioner entering the conspiracy. This recording very well could have been the rational basis for the jury's verdict in Petitioner's case.

Because the standard in an insufficient evidence claim is not whether the Court finds Petitioner's convictions were proven beyond a reasonable doubt, but rather whether a rational jury could find such, this Court must side with the Government. The evidence produced by the prosecution during Petitioner's trial, *i.e.* the audio recording, was sufficient for a reasonable jury to find Petitioner had the requisite specific intent to commit the crimes Petitioner was convicted of. Accordingly, Petitioner's ineffective assistance of appellate counsel claim for failing to raise this ground is DENIED.

### *2. Juror bias*

Petitioner next argues his appellate counsel was ineffective in failing to raise an argument that the trial court erred in two respects regarding the jury: first, in denying Petitioner's request to excuse one of the jurors for cause as a biased juror[10]; and second, in failing and refusing to declare a mistrial after the foreperson was approached by a man in the hallway during a trial break, and several jurors reporting a "chilling effect" caused by the man's presence in the courtroom. (Doc. 1 at 82-83.)

The Sixth Amendment guarantees a trial by an impartial jury comprised of "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). Jurors must decide the case solely on the evidence. *Smith v. Phillips*, 455 U.S. 209, 217 (1982). A defendant's right to a fair trial is denied if even a single juror is biased. *Dyer*, 151 F.3d at 973.

Impartiality, however, does not require a lack of any preconceptions about the defendant or the case. A presumption of impartiality applies if jurors provide assurances that they can "lay aside [their] impression or opinion and render a verdict based on the

---

[10] While Petitioner does not explicitly state which juror he is referring to, nor does he cite to the record where such a motion was denied, the Court recognizes Petitioner's trial counsel requested the trial court excuse Alternate Juror 1. (Lodgment 5 at 242.)

evidence presented in court." *Murphy v. Florida*, 421 U.S. 794, 800, (1975) (quoting *Irvin*, 366 U.S. at 723). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin*, 366 U.S. at 723. The presumption is overcome only "by demonstrating that the juror actually held a biased opinion." *Ybarra v. McDaniel*, 656 F.3d 984, 992 (9th Cir. 2011)

Moreover, "not every incident of juror misconduct requires a new trial." *United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974). "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id.* On habeas review, to obtain relief, a petitioner must show that the misconduct had a substantial and injurious effect or influence on the jury's verdict. *Henry v. Ryan*, 720 F.3d 1073, 1085 (9th Cir. 2013); *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). Additionally, trial court determinations "on juror impartiality deserve a high measure of deference." *See Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990) (internal quotation marks omitted).

### a. Request to excuse Alternate Juror 1

After trial had already commenced, Alternate Juror 1 approached the trial court and attorneys to discuss a possible conflict she had not realized during voir dire. (Lodgment 5 at 239.) During voir dire, Alternate Juror 1 had disclosed her husband worked for the Department of Justice, but did not mention exactly what her husband did there. (Lodgment 15 at 239-240.) After being seated as an alternate juror, Alternate Juror 1 disclosed she had met Epperson previously at a work function she attended with her husband approximately four years prior to the trial. (Lodgment 5 at 239.) After this disclosure, Petitioner's trial counsel informed the trial court she "would have challenged [Alternate Juror 1] had [trial counsel] known" of this previous acquaintance. (*Id.* at 242.) While trial counsel requested the trial court excuse Alternate Juror 1, the trial court found

"there [is] no meritorious reason . . . to excuse [Alternate Juror 1]." (*Id.*) Alternate Juror 1 was not called to serve as a juror in the deliberations.[11]

In making the claim appellate counsel was ineffective for failing to argue the trial court improperly denied Petitioner's request to excuse Alternate Juror 1, Petitioner has the burden to show "there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784. Petitioner presents no such argument. Instead, Petitioner makes a conclusory statement that "appellate counsel[']s failure and refusal to raise obvious non-frivolous claims" which Petitioner believes are constitutionally reversible grounds on direct appeal "which would have obtained a reversal or a more favorable outcome" constitute a violation of his right to effective assistance of counsel. (Doc. 1 at 84.) Petitioner provides no elaboration as to how each of the claims his appellate counsel failed to advance would satisfy the *Strickland* test, as required to show constitutionally ineffective assistance of counsel.

However, assuming arguendo, Petitioner had elaborated, the trial court's denial of trial counsel's request to excuse Alternate Juror 1 was not an error. The reason for this is twofold. First, the trial court ensured this previous common gathering attended by both Alternate Juror 1 and Epperson would not "in any way affect [Alternate Juror 1's] ability to be . . . fair and judge the credibility of the witnesses" and "ability to be a good judge of credibility." (Lodgment 5 at 240.) Second, Alternate Juror 1 was just that: an alternate juror. She did not participate in deliberations at the close of trial, thereby not determining Petitioner's ultimate verdicts. Thus, even if Alternate Juror 1 did have some sort of bias with respect to this previous meeting and connection to Epperson, Alternate Juror 1 did not have an opportunity to express such bias during deliberations with the jurors. *See Meza v. McDonald*, 2012 U.S. Dist. LEXIS 81998, *81 (Cal. Dist. Ct. May 18, 2012).

---

[11] During the trial, Juror 10 was excused in order to allow Juror 10 to participate in a pre-planned trip. The trial court replaced Juror 10 with Alternate Juror 3. (Lodgment 8 at 818-821.)

Given this, the trial court did not err in denying trial counsel's request to excuse Alternate Juror 1. Accordingly, Petitioner's appellate counsel was not ineffective in not raising this claim on direct appeal because as shown above, the claim is not meritorious. This claim is DENIED.

### 2. Mistrial based on "chilling effect"

On November 8, 2010, about a week and a half into Petitioner's trial, an incident occurred where a "big gentleman" wearing a red shirt, shorts, and athletic shoes sat in the back of the courtroom. (Lodgment 10 at 1342, 1344.) Petitioner's trial counsel stated on the record she was "worried that he might be here spying for the Mexican Mafia." (*Id.* at 1342.) This man also spoke with Juror Number 1 that same day. (*Id.*) Juror Number 1 told the trial court the man had initiated conversation with her, inquiring about the case, but Juror Number 1 had informed him she could not talk about the case with anyone. (*Id.* at 1347.) After the encounter, Juror Number 1 "didn't really think anything of it" until she realized the bailiff was speaking with the man. (*Id.* at 1347-48.) The trial court ensured Juror Number 1 could remain impartial and fair to both parties, despite this event. (*Id.* at 1348.) However, Juror Number 1 did request an escort to her vehicle from the courthouse. (*Id.* at 1345.)

After this encounter, two female jurors, not including Juror Number 1, had informed a Corporal at the court that "they were having issues, . . . because of this trial, they sleep with the light on. They're having trouble sleeping, period." (*Id.*) These same women had expressed that the event with Juror Number 1 had caused them "a lot of fear" in addition to that inherent given the nature of the case. (*Id.* at 1344.) Petitioner's trial counsel requested the trial court speak with these women, and the rest of the jury, individually to ensure each juror remained committed to their duty as a juror and were not affected in their ability to remain fair. (*Id.* at 1345.) Despite this request, and on the advice of the bailiff, who informed the trial court the two additional women were "fine" and "willing to do the whole trial, and have no issues," the trial court did not question any other jurors individually. (*Id.* at 1350.) Instead, the trial court posed the same questions to

the jury as a whole: "are any of you affected by anything that has been done or said during the break or at any time?" and "you're all up to the task still?" (*Id*. at 1351.) Presumably, all jurors nodded affirmatively.

Not every improper ex parte contact with a juror requires a mistrial. The Supreme Court has stressed that the remedy for allegations of jury bias is a hearing in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial. *See Remmer v. United States*, 347 U.S. 227, 229-30 1954). Here, the trial court held such a hearing after being informed of the man speaking with Juror Number 1 and having an adverse effect on the other two female jurors. After doing so, the trial court was able to determine the facts of what had occurred, the impact on the jurors, and found there was no prejudicial effect. Instead, even after this event, all the jurors, especially Juror Number 1 and the other two female jurors, informed the trial court they could affirmatively perform their duty as jurors in the case.

Thus, while this event was not ideal, it was not grounds for a mistrial. The trial court handled the concerns properly and did not err in failing to declare a mistrial *sua sponte*. Accordingly, Petitioner's argument his appellate counsel was ineffective for failing to raise this claim is DENIED.

### *3. Cruel and unusual punishment*

Petitioner claims he received ineffective assistance from his appellate counsel because appellate counsel failed to raise cruel and unusual punishment on Petitioner's direct appeal. (Doc. 1 at 88-89.) However, Petitioner does not elaborate as to what he feels has violated his Eighth Amendment protection from cruel and unusual punishment. In fact, the only other time this claim is referenced is in Petitioner's first letter sent to his appellate counsel. (*Id*. at 89-93.) Only therein as a final point did Petitioner request "since the appellate courts are unpredictable," that appellate counsel raise "any meritorious grounds such as . . . [the Eighth] amendment," among other things. (*Id*. at 92.)

"'After incarceration, only the "unnecessary and wanton infliction of pain" . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley*

*v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977), in turn quoting standard originally described in *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (internal citation omitted)). Under traditional Eighth Amendment analysis, the Court must first consider whether there is an "infliction of pain," and, if so, whether that infliction is "unnecessary and wanton."

Here, Petitioner has offered no facts upon which to base his claim that he has suffered cruel and unusual punishment. Instead, Petitioner makes the conclusory argument that his appellate counsel was ineffective in choosing to not raise this claim in Petitioner's direct appeal. Without specific facts, the Court cannot affirmatively find Petitioner's appellate counsel was ineffective in not raising this claim on appeal. Accordingly, Petitioner's claim to this extent is DENIED.

### 4. Prosecutorial misconduct

Petitioner next claims that by not raising prosecutorial misconduct in his direct appeal, his appellate counsel was ineffective. (Doc. 1 at 83.) This claim has two parts. First, Petitioner argues the prosecutor engaged in "constant misconduct," consisting of "insu[]lts and ag[g]resive misconduct against defense counsel throughout the whole jury trial," examples of which are "accusing trial counsel of intimidating witnesses and of asking witnesses to lie." (*Id*.) While Petitioner does not cite to any one specific instance which he believes warrants such a claim, the Court has discovered three instances which may have led Petitioner to believe such a claim would be valid.

In a hearing on September 29, 2011, trial counsel and the prosecution were discussing discovery requests when the exchange became heated. (Lodgment 5 at 21.) The prosecution questioned trial counsel as to the prosecution's "understanding [trial counsel had] served a bunch of people" already and during the hearing trial counsel stated she had not. (*Id*.) Trial counsel reacted immediately by stating she had not served anyone, and she was unclear where the prosecution had learned such information. (*Id*. at 21-22.)

Specifically, trial counsel was defending what she perceived to be the prosecution calling her "a liar." (*Id*. at 22.)

Next, on the first day of trial, before beginning voir dire, the prosecution accused trial counsel of disseminating a debrief written by the victim. (Lodgment 4 at 81.) Additionally, the prosecution alleged trial counsel had informed the victim of such facts. Trial counsel responded that the prosecution was exaggerating the claim; instead, trial counsel had visited the victim for a witness interview, and during such interview the witness referred to the debrief. (*Id*. at 85.) Furthermore, at this time, trial counsel responded to the prosecution's previous allegations that trial counsel "was telling witnesses to lie." (*Id*. at 82.) Trial counsel vehemently denied this, stating an investigator was present with her at all times, and all of the alleged benefits she had supposedly offered these inmates never came to fruition. (*Id*. at 83-84.)

Second, Petitioner argues the prosecutor violated California Rule of Professional Conduct (CRPC) 5-110 and the American Bar Association Rule of Professional Conduct (ABA) Rule 3.8. Petitioner claims these rules were violated by the prosecution "institut[ing] criminal charges when the prosecutor knew Petitioner was an undercover C.I." who was merely feigning participation to preserve his own life in the prison. (*Id*.)

### a. Prosecutorial misconduct through trial conduct

A defendant's due process rights are violated only when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id*.; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) (stating that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Claims of prosecutorial misconduct where a proper objection was lodged at trial are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995). Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the

outcome of the trial, *i.e.*, that absent the alleged impropriety, the verdict probably would have been different. *Cortez v. Lopez*, 2014 U.S. Dist. LEXIS 35641, *91 (Cal. E.D. Mar. 18, 2014). Under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved on appeal. *See People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983).

To the extent this claim of prosecutorial misconduct is premised on statements made by the prosecutor during hearings outside the presence of the jury, Petitioner has failed to show how any such comments infected his trial with unfairness. Petitioner cites no legal authority in support of his claim that a prosecutor's improper statements outside the presence of the jury violates a defendant's due process rights. Accordingly, because an appellate attorney is not required to raise claims which are clearly not meritorious, Petitioner's claims to this extent are not persuasive. Petitioner's claim is DENIED.

### b. Prosecutorial violation of CRPC 5-110 and ABA Rule 3.8

CRPC 5-110 presents the special responsibilities of a prosecutor. This rule holds a prosecutor in a criminal case shall: not pursue charges unsupported by probable cause; ensure the defendant is not improperly denied counsel; not take advantage of an unrepresented defendant and obtain a waiver of pretrial rights, unless the defendant is proceeding pro se; use reasonable care to ensure no agent of the prosecutor makes a statement the prosecutor would not be allowed to make under CRPC 5-120; when a prosecutor is aware of a reasonable likelihood a convicted defendant did not in fact commit the crime of which he was convicted, the prosecutor should take appropriate action to remedy the wrongful conviction; and when a prosecutor is aware of "clear and convincing evidence establishing" a defendant convicted of an offense he did not commit, the prosecutor "shall seek to remedy the conviction." Cal. Rules of Prof'l Conduct, Rule 5-110. The corresponding ABA rule 3.8 states the same, and adds the following: a prosecutor shall timely disclose all evidence which tends to negate the defendant's guilt and shall not subpoena a lawyer in a grand jury, with limited exceptions. MODEL RULES OF PROF'L RESPONSIBILITY r. 3.8 (1983).

Petitioner specifically alleges the prosecutor violated these rules by "instituting criminal charges when the prosecutor knew Petitioner was an undercover C.I. . . . , with no probable cause to be charged, [and] knowing [Petitioner] was innocent; . . ." (Doc. 1 at 83.) Thus, Petitioner presumably is claiming the prosecution violated two sections of these rules: bringing charges not based on probable cause and not taking appropriate steps to remedy the conviction of an innocent defendant. Cal. Rules of Prof'l Conduct, Rule 5-110(A), (G).

Regarding the prosecution's alleged lack of probable cause in bringing the charges against Petitioner, "In California, as in virtually every other jurisdiction, it is a long-standing principle of common law that a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes prima facie – but not conclusive – evidence of probable cause." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004) (citations omitted). In this case, Petitioner was able to present his case at a preliminary hearing, where he was presumably represented by counsel, and it was at such a hearing where Petitioner could have first argued there was no probable cause for the charges. The Petitioner's case proceeding beyond this preliminary hearing leads to a prima facie showing of probable cause to bring the charges. *Id*. Despite this presumption, Petitioner does not present any rebuttal in alleging his appellate counsel was ineffective for failing to raise this argument on direct appeal. Instead, Petitioner merely states this perceived prosecutorial violation in part of a multiple page long list of claims he believes his appellate counsel should have raised on appeal. (Doc. 1 at 82-82.)

Because Petitioner has not provided any argument to rebut the prima facie showing of probable cause, his claim that the prosecution brought the charges against him without any such probable cause cannot succeed. Therefore, this claim is meritless and Petitioner's appellate counsel was not ineffective in failing to raise it.

Similarly, Petitioner's argument that the prosecution violated its ethical duty in failing to take the prescribed steps after a prosecutor realizes an innocent defendant has been convicted is not meritorious. Cal. Rules of Prof'l Conduct, Rule 5-110(G).

"'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614 (1998); *Calderon v. Thompson*, 523 U.S. 538, 559 (1998); *Muth v. Fondren*, 676 F.3d 815, 819, 822 (9th Cir.), *cert. denied*, 568 U.S. 894 (2012). "The evidence of innocence 'must be so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Lee v. Lampert*, 653 F.3d at 937-38 (quoting *Schlup*, 513 U.S. at 316). The court must consider "'all the evidence, old and new, incriminating and exculpatory,' admissible at trial or not." *Lee*, 653 F.3d at 938 (quoting *House v. Bell*, 547 U.S. 518 (2006). The court must make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id*. (quoting *House*, 547 U.S. at 538).

In his petition, Petitioner claims he is innocent a total of ten times. (Doc. 1 at 15, 19, 21, 25, 35, 38, 83, 87, 92, 100.) Despite Petitioner's claims, Petitioner does not offer any logical argument to refute the final jury verdict, which found Petitioner guilty. In this case, the prosecution introduced evidence which showed Petitioner, regardless of whether defected or an active associate of the Mexican Mafia, engaged in Mexican Mafia business while incarcerated, which included dictating a kite ordering inmates to murder the victim. Petitioner, at trial, argued the kite had never been sent, but instead had been flushed down the toilet, thereby negating Petitioner's orders. However, the recording which has Petitioner's voice making this dictation is overwhelming evidence; and the defense simply did not overcome this. Petitioner, in his collateral attack, argues an entrapment defense, which Petitioner believes undermines the prosecution's evidence and shows Petitioner's actual innocence. [12] The Court agrees with the Superior Court's analysis of Petitioner's entrapment defense. (Lodgment 23.) The Superior Court stated "even if there had been outrageous government misconduct in this case, which there was not, a normal

---

[12] Petitioner raised entrapment as a substantive claim in his petition before this Court. (Doc. 1 at 92-100.) In an effort to minimize duplication of analysis, the Court uses this short analysis to dispel both Petitioner's substantive claim of entrapment as well as Petitioner's claim of ineffective assistance of counsel for failing to raise a claim of entrapment.

law-abiding person would not resort to murder in an attempt to dominate and control prison gang activities." (*Id*. at 4-5.) Thus, because both of these attempts at showing Petitioner is actually innocent fail, Petitioner's claim that the prosecution owed Petitioner some duty because Petitioner was innocent must also fail.

Accordingly, Petitioner's full claim arguing his appellate counsel was ineffective for failing to raise prosecutorial misconduct on direct appeal is not meritorious and is therefore DENIED.

### 5. *Judicial Misconduct*

Petitioner next alleges his appellate counsel was ineffective for not raising a claim of judicial misconduct in Petitioner's direct appeal. (Doc. 1 at 83.) Petitioner alleges the trial judge made "'sexual/sexist' jokes to the jurors and courtroom throughout" the proceeding. (*Id*.) Additionally, Petitioner alleges the trial judge was hostile towards the defense team. (*Id*.) While Petitioner makes these allegations against the trial court judge, Petitioner does not point to the record to direct the Court to these perceived acts of misconduct.

A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

A state judge's conduct must be significantly adverse to a defendant before it violates constitutional requirements of due process and warrants federal intervention. *Id*.; *Garcia v. Warden, Dannemora Correctional Facility*, 795 F.2d 5, 8 (2d Cir. 1986). It is not enough that a federal court not approve of a state judge's conduct. Objectionable as the conduct at issue might be, when considered in the context of the trial as a whole it may not be of sufficient gravity to warrant the conclusion that fundamental fairness was denied. *Duckett*, 67 F.3d 734 at 741 (citations omitted).

Frankly, due to the lack of elaboration from Petitioner on this claim, the Court cannot reasonably determine Petitioner's due process rights were violated by the trial judge's remarks. Thus, Petitioner's claim to this extent must fail. Accordingly, Petitioner's claim of ineffective assistance of appellate counsel for failing to raise this claim is DENIED.

### 6. Cumulative Error[13]

Petitioner next claims his appellate counsel was constitutionally ineffective for failing to raise cumulative error as a grounds for relief on direct appeal. (Doc. 1 at 82-83.) The cumulative error doctrine recognizes that the cumulative effect of several errors may prejudice a defendant to the extent that his conviction must be overturned. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). The cumulative error doctrine, however, does not permit the Court to consider the cumulative effect of non-errors. *See Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999), *overruled on other grounds*, *Slack v. McDaniel*, 529 U.S. 473 (2000) ("where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation").

As discussed at length above, there were no errors in Petitioner's trial sufficient to warrant a reversal. Nor were there any errors at all. In fact, Petitioner had a full and fair trial where he was represented by a zealous advocate. Because there are no errors to accumulate, there cannot be any cumulative error which would warrant a reversal. Therefore, Petitioner's claim his appellate counsel was ineffective for failing to raise a cumulative error claim on direct appeal is DENIED.

### 7. IAC of appellate counsel conclusion

Petitioner raised multiple claims which he argued were sufficient to lead the Court to reverse Petitioner's convictions. Particularly, Petitioner argued his appellate counsel

---

[13] Petitioner also raised this claim as a separate substantive claim in his petition for writ of habeas corpus. (Doc. 1 at 89.) Based on the Court's prior ruling, however, the Court will analyze this issue primarily under an ineffective assistance of counsel analysis. (Doc. 28.)

3:16-cv-00911-H-PCL

failed to make twelve claims when she filed his direct appeal which Petitioner argues would have warranted a reversal of his convictions. (Doc. 1 at 82-83.) All of these arguments, however, are frivolous and not meritorious. "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel." *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982). Based on this, Petitioner's claim for habeas relief based on ineffective assistance of counsel is DENIED.

Moreover, because none of Petitioner ineffective assistance claims had merit, the Martinez exception cannot apply to overcome the procedural default. Therefore, Petitioner's petition fails based timeliness, procedural default, and on the merits.

## V. CONCLUSION

This Report and Recommendation is submitted to the Honorable Marilyn L. Huff, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **<u>DENYING</u>** the Petition for Writ of Habeas Corpus.

Any party may file written objections with the Court and serve a copy on all parties on or before **<u>March 20, 2018</u>**. The document should be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Ylst*, 951 F.2d at 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATE: February 20, 2018

Peter C. Lewis
United States Magistrate Judge

45