# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MANUEL GARCIA,<br><br>                    Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary of the California Department of Corrections and Rehabilitation,<br><br>                    Respondent. | Case No.: 3:16-cv-00911-H-PCL<br><br>**ORDER:**<br><br>**(1) ADOPTING REPORT AND RECOMMENDATION; and**<br><br>**(2) DISMISSING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>[Doc. Nos. 1, 39.] |

On April 14, 2016, Petitioner Jose Manuel Garcia, a pro se prisoner at the Mule Creek State Prison in Ione, California, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions for: (i) conspiracy to commit murder, Cal. Penal Code §§ 182(a)(1), 187(1); (ii) attempted murder through a conspiracy or aiding and abetting theory, Cal. Pen Code §§ 187(a), 664; (iii) solicitation of murder, Cal. Penal Code § 653f(b); and (iv) assault with a deadly weapon by a prisoner, Cal. Penal Code § 4501. (Doc. No. 1.) On February 20, 2018, the Hon. Peter C. Lewis issued a Report and Recommendation recommending that the Court deny all relief. (Doc. No. 39.) Objections to the Report and Recommendation were due by March 20, 2018, but Petitioner has not

filed objections (or even a traverse) as of the date of this Order. For the reasons that follow, the Court adopts the Report and Recommendation as supplemented by the reasoning in this Order, and dismisses the petition.

## Background

### I. Factual History

The California Court of Appeal described the facts relevant to Petitioner's case as follows:

> On July 5, 2010, the victim in this case—Victoriano Ortiz, an inmate at Donovan—was walking in a prison yard with two allies, Geronimo Polina ("Blue") and Manuel Gonzalez ("Stomper"). Blue suddenly turned on Ortiz and attacked him. Numerous other inmates quickly joined the assault on Ortiz, while other inmates attacked Stomper. The prosecution's theory was that the attack was the outcome of a power struggle between two rival factions of the Mexican Mafia then competing for control of Donovan, one of which was led by Ortiz and his "mesa," and the other led by a mesa composed of [Petitioner] ("Crazy Joe"), Morones, and two others. The Mexican Mafia seeks to control prisons using mesas as a command system, which is in effect a governing council. Ordinarily, the chief of the mesa is a "shot-caller" or "key-holder," and he has two or three "helpers" to help run various aspects or areas of the prison. The shot-caller and his helpers comprise the mesa. He derives his authority to run the prison from a "member" of the Mexican Mafia.
>
> A.  *The Principal Participants*
>
> Morones was an associate in the Mexican Mafia serving a life sentence at Donovan. His eventual ally, [Petitioner], is also an active Mexican Mafia associate. Ortiz testified at trial about the structure of the Mexican Mafia. At the bottom of the organizational pyramid are "southsiders," all members of Hispanic street gangs in southern California. These gang members must remit "taxes" (a portion of the proceeds of their illegal activity) to the Mexican Mafia. The next higher level consists of "surenos" or "soldiers," gang members who have garnered authority and more respect than southsiders by working for the Mexican Mafia, collecting taxes or enforcing orders through violent attacks. Above the surenos are "associates," who have worked their way up and are close to "members" (also referred to as "carnals") of the Mexican Mafia. At the top of the pyramid are the carnals, who can order someone killed or assaulted (also called "giving the green light") if the target is not respecting the authority of the Mexican Mafia. Such an order must be

followed by all persons within the structure. Orders to attack someone, when issued by the mesa operating under a carnal's authority to run a prison, must be treated with the same obedience.

Ortiz was an associate in the Mexican Mafia and was incarcerated at Donovan to serve time for an assault he committed on its behalf. Ortiz believed his authority to run Donovan derived from his association with and permission from Richard Buchanon.

B. *The Power Struggle for Control of Donovan and the Attack on Ortiz*

Ortiz arrived at Donovan in March 2010 and almost immediately sent out word, through "kites" and word of mouth, that he was now in charge of Donovan and whoever was in charge needed to step down or risk being assaulted. "Kites" are small handwritten notes by which messages are surreptitiously passed to other inmates within the prison (either between cells within a cell block or even between cell blocks) or to persons outside the prison. Ortiz also formed his mesa, which included Stomper (Ortiz's right-hand man), an inmate named "Pino," and Morones. At one point, Morones asked Ortiz for paperwork containing Ortiz's authority, but Buchanon had verbally authorized Ortiz to run Donovan.

Another group apparently disagreed with Ortiz's attempt to exert control, and Ortiz believed this group was trying to challenge his authority. The group included Morones, who had been in a dispute with Stomper, and Pablo Franco ("Casper"). That group began sending kites asserting its authority to run Donovan, which those in the group believed was derived from another carnal, and included messages to Ortiz that Ortiz "had something coming."

When Ortiz noticed that southsiders were beginning to follow Morones's group, he tried to reassert his authority because there can only be one mesa running a prison. Ortiz's efforts to regain control included writing a kite to Morones asking to resolve the power struggle (an offer that did not bear fruit) and challenging Casper to a fight, which Casper declined. Ortiz interpreted Casper's response as acquiescing to Ortiz's authority, and he sent a kite to Casper indicating they both were now working under Buchanon's authority. Ortiz formed a new mesa, including Stomper, Blue and Isaac Balesteros ("Lazy"). For the next month, everything appeared calm with Ortiz in control. However, in late June or early July, problems over control reemerged after Rudy Espudo ("Crazy Boy"), a carnal, was temporarily incarcerated at Donovan. Espudo gave authority over Donovan to Morones, [Petitioner]

3

> (Morones's cellmate), and two other inmates (Casper and an inmate with the moniker "Oso"). Almost immediately, [Petitioner] began yelling on the tier of their cell block that he had "authority" and threatened that Ortiz and Stomper had "something coming", which Ortiz understood to mean he was targeted for attack. Ortiz also saw kites written by [Petitioner] and Morones ordering Ortiz be "whacked" with "no exceptions."
>
> Authorities had placed [Petitioner] in a cell that was surreptitiously wired, and, during this period, numerous recordings were made of conversations between Morones and [Petitioner], as well as of conversations they had with other inmates. Some of the recordings from July 2, 2010 (three days before the attack on Ortiz and Stomper) showed that Morones had already begun writing a kite to Lazy when [Petitioner] began contributing to the kite. [Petitioner] told Morones to ensure that the kite declare Espudo's direct orders had established the new mesa, and the new mesa was ordering both Lazy and Blue (members of Ortiz's inner circle) to whack Ortiz and Stomper "on this next yard with no exceptions." The next day, July 3, [Petitioner] and Morones discussed whether Ortiz was going to come out to the yard and that he had group yard, and appellant said, "[T]hat's a good thing, that way we can blast the fuck out of him."
>
> When Ortiz went to walk in the prison yard on July 5, 2010, he knew he was risking his safety because there was a chance he would be assaulted. However, he believed he still had authorization to run Donovan and could not show fear, so he nevertheless went into the yard. As Ortiz was walking with two of his allies (Blue and Stomper), Blue suddenly turned on Ortiz and began punching and cutting at him. Other inmates joined in the attack on Ortiz while yet another group of inmates attacked Stomper. Although correctional officers responded by ordering the inmates to get down, and thereafter by firing some shots when the inmates ignored the command, the attackers did not immediately cease but instead continued stabbing Ortiz and banging his head against a wall. Ortiz suffered head and other injuries from the attack.

People v. Garcia, No. D062370, 2014 WL 630307, at *2–3 (Cal. Ct. App. Feb. 19, 2014) (formatting altered). These facts are presumed correct unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Petitioner has not argued that the Court of Appeal committed any factual errors.

## II. Procedural History

In November of 2011, a jury convicted Petitioner of (i) conspiracy to commit

4

murder, Cal. Penal Code §§ 182(a)(1), 187(1); (ii) attempted murder through a conspiracy or aiding and abetting theory, Cal. Pen Code §§ 187(a), 664; (iii) solicitation of murder, Cal. Penal Code § 653f(b); and (iv) assault with a deadly weapon by a prisoner, Cal. Penal Code § 4501. (Doc. No. 32-13, Trial Tr., PageID 1667–69.) The San Diego County Superior Court sentenced Petitioner to 25 years to life plus 19 years determinate. (Doc. No. 8-11, Cal. Ct. App. Habeas Op'n, PageID 1307.)

Petitioner appealed his conviction and sentence to the Fourth District Court of Appeal. On February 19, 2014, the Court of Appeal rejected Petitioner's claims of instructional error and ineffective assistance of counsel, but agreed that the trial court had incorrectly calculated Petitioner's sentence. Garcia, 2014 WL 630307, at *14. The California Supreme Court summarily denied Petitioner's petition for review on June 11, 2014. (Doc. No. 32-22.) Petitioner was sentenced to 25 years to life plus 9 years determinate on remand. (Doc. No. 8-11 PageID 1307.)

On December 29, 2014, Petitioned filed a petition for a writ of habeas corpus in the Superior Court, raising claims for: (i) insufficiency of the evidence; (ii) entrapment; (iii) juror bias and misconduct; (iv) ineffective assistance of trial counsel; (v) ineffective assistance of appellate counsel; (vi) erroneous imposition of fines and fees; (vii) cruel and unusual punishment; and (viii) cumulative error. (Doc. No. 32-23.) The Superior Court concluded that Petitioner failed to make a prima facie showing on any of his claims and denied all relief. (Doc. No. 32-25.)

Petitioner subsequently re-raised the same claims in habeas petitions filed before the Court of Appeal and the California Supreme Court. The Court of Appeal held that all of Petitioner's claims were untimely, and thus procedurally barred, and in the alternative rejected the claims on the merits. (Doc. No. 32-27.) The California Supreme Court summarily denied relief on October 14, 2015. (Doc. No. 32-29.)

On April 14, 2016, Petitioner filed the instant petition, which re-asserts the same claims that were denied three times by the California courts. (Doc. No. 1.) After initial motion practice, Respondent answered the petition on May 10, 2017. (Doc. No. 31.)

Although the Magistrate Judge granted Petitioner multiple extensions of time, (Doc. Nos. 34, 37), Petitioner has not filed a traverse as of the date of this Order.

On February 20, 2018, the Magistrate Judge issued a Report and Recommendation concluding that Petitioner's claims are untimely, procedurally defaulted, and otherwise fail on the merits. (Doc. No. 39.) Although objections to the Report and Recommendation were due by March 20, 2018, Petitioner has not filed any objections as of the date of this Order.

### III. Standard of Review

Petitioner's claims are governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "An application for a writ of habeas corpus . . . shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State." Id. § 2254(b)(1)(A). Additionally, an "application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(1)–(2).

In determining whether to defer to a state court's denial of a habeas petitioner's claims, the Court reviews the reasoning of the last state court to have denied the claims on the merits. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). In this case, the California Supreme Court denied Petitioner's claims without explanation. (Doc. No. 32-29.) The Court must thus "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." Id. The Court therefore focuses its attention on the

California Court of Appeal's denial of Petitioner's application for post-conviction relief. (Doc. No. 32-27.)

The Court of Appeal denied Petitioner's state habeas petition as "untimely" and thus "procedurally barred" because Petitioner "waited more than two years after he was sentenced to assert" his claims, and "offered no explanation for the delay." (Id. PageID 5094 (citing In re Reno, 55 Cal. 4th 428, 459 (2012), and In re Swain, 34 Cal. 2d 300, 302 (1949)).) "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). The Supreme Court has held that California's timeliness rule for state habeas petitions constitutes an independent and adequate state procedural ground barring subsequent habeas relief in federal court. See Walker v. Martin, 562 U.S. 307, 317 (2011); see also Ayala v. Chappell, 829 F.3d 1081, 1095 (9th Cir. 2016) ("Walker holds that California's timeliness rule is an independent and adequate state law ground sufficient to bar federal habeas relief on untimely claims."). However, AEDPA gives district courts discretion to deny habeas petitions on the merits following de novo review notwithstanding any potential procedural default. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Flournoy v. Small, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012) ("While we ordinarily resolve the issue of procedural bar prior to any consideration of the merits on habeas review, we are not required to do so when a petition clearly fails on the merits."); see also Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review.").

**Discussion**

After reviewing the petition de novo, the Court concludes that all of Petitioner's claims fail on the merits. The Court thus exercises its discretion to sidestep any analysis of procedural default. See 28 U.S.C. § 2254(b)(2). The Court also agrees with the Report and Recommendation that Petitioner's claims are time barred.

**I.    Merits Analysis**

**A.    Sufficiency of the Evidence**

Petitioner first argues that the State failed to present sufficient evidence to prove his specific intent to kill Ortiz and Gonzalez beyond a reasonable doubt. (Doc. No. 1 PageID 36–39.) In Jackson v. Virginia, the Supreme Court held that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." 443 U.S. 307, 318 (1979) (footnote omitted). This "inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Id. at 318–19 (emphasis in original) (quoting Woodby v. INS, 385 U.S. 276, 282 (1966)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).

At trial, the prosecution played audio recordings of Petitioner calling for Ortiz and Gonzalez's deaths, and also presented evidence that Petitioner wanted to kill Ortiz and Gonzalez to establish control of the prison. (Doc. No. 32-13 PageID 3833–34.) Petitioner argues that this evidence is insufficient to prove his specific intent to kill because he was actually a confidential informant for the State, and that he was only pretending to cooperate in the conspiracy to further the objectives of law enforcement. (Doc. No. 1 PageID 38.) However, the prosecution put on evidence that Petitioner was specifically admonished not to commit any further crimes while acting as an informant, and that he was not authorized to participate in the murder conspiracy. (Doc. No. 32-13 PageID 3838–39.) A rational

8

jury could have believed the government's evidence and found that Petitioner's actions were outside the scope of his confidential informant relationship with the State. The Court therefore finds the evidence sufficient to support Petitioner's convictions.

### B. Juror Bias

The Sixth Amendment guarantees a trial by an impartial jury comprised of "indifferent" jurors. Irvin v. Dowd, 366 U.S. 717, 722 (1961); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998). Jurors must decide the case solely on the evidence. Smith v. Phillips, 455 U.S. 209, 217 (1982). A defendant's right to a fair trial is denied if even a single juror is biased. Dyer, 151 F.3d at 973.

Impartiality, however, does not require a lack of any preconceptions about the defendant or the case. A presumption of impartiality applies if jurors provide assurances that they can "lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." Murphy v. Florida, 421 U.S. 794, 800 (1975) (quoting Irvin, 366 U.S. at 723). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." Irvin, 366 U.S. at 723. The presumption is overcome only "by demonstrating that the juror actually held a biased opinion." Ybarra v. McDaniel, 656 F.3d 984, 992 (9th Cir. 2011)

Moreover, "not every incident of juror misconduct requires a new trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974). "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." Id. On habeas review, to obtain relief, a petitioner must show that the misconduct had a substantial and injurious effect or influence on the jury's verdict. Henry v. Ryan, 720 F.3d 1073, 1085 (9th Cir. 2013); Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000). Additionally, trial court determinations "on juror impartiality deserve a high measure of deference." See Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990) (internal quotation marks omitted).

Petitioner alleges that a number of the jurors in his case were biased against him,

and that the state trial court erred in failing to excuse these jurors. The Court will address each claim of juror bias in turn.

### 1. Juror Nos. 4, 8, 9, and 10

Petitioner argues that Juror Nos. 4, 8, 9, and 10 were each impliedly biased against him. (Doc. No. 1 PageID 41–42.) The Ninth Circuit has explained that:

> Implied bias is "bias conclusively presumed as a matter of law." [United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000)], quoting 47 Am.Jur.2d Jury § 266 (1995). The inquiry here is "whether an average person in the position of the juror in controversy would be prejudiced." Id. at 1112, quoting United States v. Cerrato-Reyes, 176 F.3d 1253, 1260-61 (10th Cir. 1999) (emphases and internal quotation marks omitted). Thus, we have presumed a challenged juror's bias "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990), quoting Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988). We have cautioned, however, that bias should be presumed only in "extreme" or "extraordinary" cases. Tinsley, 895 F.2d at 527, quoting Smith v. Phillips, 455 U.S. 209, 222, 223 n. *, (1982) (O'Connor, J., concurring); see also Fields, 503 F.3d at 770 (holding that bias should be presumed only in "extreme situations").

United States v. Mitchell, 568 F.3d 1147, 1151 (9th Cir. 2009).

Petitioner argues that Juror Nos. 4, 8, 9, and 10 were all impliedly biased against him because they either worked in law enforcement (Juror No. 4 was a probation officer), had friends or family members in law enforcement or law school (Juror Nos. 4, 9, and 10), or had been jurors in past civil or criminal trials (Juror Nos. 4, 8, and 10). (Doc. No. 1 PageID 41–42.) However, none of these benign and commonplace characteristics, without more, even arguably show that this is the "extreme or extraordinary" case "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Mitchell, 568 F.3d at 1151 (citation omitted); see also Cruz v. Ryan, No. CV-13-0389-TUC-JGZ, 2018 WL 1524026, at *38 (D. Ariz. Mar. 28, 2018) ("Courts

have declined to find implied bias when a juror works in law enforcement or is related to a police officer."); Jill Gustafson et al., 47 Am.Jur.2d Jury § 245 n.2 (May 2018 Update) (collecting cases for the proposition that the "fact that prospective jurors have served on a jury in a criminal prosecution against another defendant charged with a similar offense does not require their disqualification"). Because Petitioner has put forward no evidence of actual bias, his juror bias claims against Juror Nos. 4, 8, 9, and 10 necessarily fail.

### 2. Juror No. 1

During Petitioner's trial, a large man who Petitioner's trial counsel suspected as being a member of the Mexican Mafia spoke with Juror No. 1, inquiring about the case. (Doc. No. 32-11 PageID 3641–51.) Juror No. 1 told the man that she could not discuss the case, and reported the contact to the trial court. (Id.) The trial court held a hearing outside of the presence of the jury to discuss the incident, and was told by court security staff that several jurors had expressed fear of the large man, who had been escorted out of the courthouse. (Id.) The trial court asked Juror No. 1 whether she could remain fair and impartial in light of the incident, and Juror No. 1 responded that she could. (Id.) The trial court then called the rest of the jury back into the courtroom, and asked if any among them had been affected by the incident, or otherwise could not continue to be fair and impartial. (Id.) No jurors indicated any concerns. (Id.)

Petitioner argues that the trial court erred by failing to declare a mistrial. (Doc. No. 1 PageID 65–76.) However, the trial court conducted a hearing inquiring into the incident, see Remmer v. United States, 347 U.S. 227, 229 (1954), thoroughly questioned Juror No. 1, learned that the improper contact had not been detailed or extensive, and ascertained that Juror No. 1 (and the rest of the jurors) could continue to be fair and impartial going forward. The trial court's findings are entitled to deference on habeas review. Gonzalez, 214 F.3d at 1112 ("Because determinations of impartiality may be based in large part upon demeanor, this court typically accords deference to the [trial court's] determinations, and reviews a court's findings regarding actual juror bias 'for manifest error' or abuse of discretion."). Petitioner has not made a sufficient showing to demonstrate that actual bias

11

3:16-cv-00911-H-PCL

have declined to find implied bias when a juror works in law enforcement or is related to a police officer."); Jill Gustafson et al., 47 Am.Jur.2d Jury § 245 n.2 (May 2018 Update) (collecting cases for the proposition that the "fact that prospective jurors have served on a jury in a criminal prosecution against another defendant charged with a similar offense does not require their disqualification"). Because Petitioner has put forward no evidence of actual bias, his juror bias claims against Juror Nos. 4, 8, 9, and 10 necessarily fail.

### 2. Juror No. 1

During Petitioner's trial, a large man who Petitioner's trial counsel suspected as being a member of the Mexican Mafia spoke with Juror No. 1, inquiring about the case. (Doc. No. 32-11 PageID 3641–51.) Juror No. 1 told the man that she could not discuss the case, and reported the contact to the trial court. (Id.) The trial court held a hearing outside of the presence of the jury to discuss the incident, and was told by court security staff that several jurors had expressed fear of the large man, who had been escorted out of the courthouse. (Id.) The trial court asked Juror No. 1 whether she could remain fair and impartial in light of the incident, and Juror No. 1 responded that she could. (Id.) The trial court then called the rest of the jury back into the courtroom, and asked if any among them had been affected by the incident, or otherwise could not continue to be fair and impartial. (Id.) No jurors indicated any concerns. (Id.)

Petitioner argues that the trial court erred by failing to declare a mistrial. (Doc. No. 1 PageID 65–76.) However, the trial court conducted a hearing inquiring into the incident, see Remmer v. United States, 347 U.S. 227, 229 (1954), thoroughly questioned Juror No. 1, learned that the improper contact had not been detailed or extensive, and ascertained that Juror No. 1 (and the rest of the jurors) could continue to be fair and impartial going forward. The trial court's findings are entitled to deference on habeas review. Gonzalez, 214 F.3d at 1112 ("Because determinations of impartiality may be based in large part upon demeanor, this court typically accords deference to the [trial court's] determinations, and reviews a court's findings regarding actual juror bias 'for manifest error' or abuse of discretion."). Petitioner has not made a sufficient showing to demonstrate that actual bias

11
3:16-cv-00911-H-PCL

infected the jury's deliberations.

### 3. Juror No. 7

During trial, Juror No. 7 alerted the trial court that she found defense counsel's side-conversations during the prosecution's remarks irritating. (Doc. No. 1 PageID 58–65.) After this incident, defense counsel alleged that Juror No. 7 consistent gave the defense team "dirty looks." (Id.) The trial court subsequently asked the jury whether anything had changed that had diminished their ability to be fair and impartial, and no juror indicated any problems. (Id.) Later, Petitioner alleges that Juror No. 7 looked at the defense table and laughed/choked in the direction of defense counsel. (Id.) The trial court asked Juror No. 7 whether anything was amiss, and she indicated that she had choked on her gum. (Id.)

Petitioner claims that Juror No. 7 exhibited actual bias in her "rude" behavior. However, the trial court was in the best position to observe Juror No. 7's behavior and demeanor, and did not find her deportment problematic enough to warrant further exploration despite defense counsel's objections. The record furnishes no basis for this Court to second-guess the trial court's management of Juror No. 7.

### 4. Alternate Juror No. 1

Finally, Petitioner alleges that Alternate Juror No. 1 was impliedly biased against him because she knew the prosecution's gang expert socially through her husband's employment. (Doc. No. 1 PageID 48.) However, Alternate Juror No. 1 did not participate in the jury's deliberations, and the record discloses no evidence that Alternate Juror No. 1 discussed the case with any of the deliberating jurors. Thus, even assuming that Alternate Juror No. 1 was biased against Petitioner, that bias cannot have tainted Petitioner's trial. See Meza v. McDonald, No. CV 10–3682–JFW (PLA), 2012 WL 2159912, at *29 (C.D. Cal. May 18, 2012) (rejecting claim that alternate juror was biased where Petitioner did "not cite any evidence that any deliberating juror was prejudiced, improperly influenced, or exhibited any undue bias"); report and recommendation adopted 2012 WL 2159858 (C.D. Cal. June 11, 2012).

**C. Sentencing Fine**

Petitioner argues that the trial court exceeded its authority under the California Penal Code when it imposed a restitution fine and other fees. (Doc. No. 1 PageID 85.) However, as Respondent notes and the Magistrate Judge correctly determined, the Ninth Circuit has "repeatedly recognized that the imposition of a fine, by itself, is not sufficient to meet § 2254's jurisdictional requirements." Bailey v. Hill, 599 F.3d 976, 979 (9th Cir. 2010). Thus, "§ 2254 does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence." Id. at 982. Accordingly, the Court lacks jurisdiction to consider Petitioner's argument.

**D. Cruel and Unusual Punishment**

Petitioner next argues that his sentence of twenty-five years to life plus various gang enhancements amounts to cruel and unusual punishment in violation of the Eighth Amendment because it is grossly disproportionate to the offense for which it was imposed. (Doc. No. 1 PageID 87.) See Solem v. Helm, 463 U.S. 277, 284 (1983). The Court disagrees. The Supreme Court has upheld a sentence of twenty-five years to life in prison for stealing a set of golf clubs under California's three strikes law against an Eighth Amendment challenge. Ewing v. California, 538 U.S. 11, 28 (2003). By contrast, Petitioner was convicted of conspiring to commit murder—the most serious crime recognized in American law. This is not the "exceedingly rare" case where a sentence is "grossly disproportionate" to the crime. See Taylor v. Lewis, 460 F.3d 1093, 1098 (9th Cir. 2006) (citations and quotation marks omitted).

**E. Entrapment**

Petitioner additionally argues that he was entrapped by the government into entering the murder conspiracy. (Doc. No. 1 PageID 92–100.) Petitioner alleges that while working as a confidential information for the government, he was placed in the middle of a power struggle at Donovan without his consent and forced to play the role of a gang member to protect himself and his family. (Id.) He alleges that officers knew he would not be able to avoid detection as a confidential informant if he did not join the murder conspiracy. (Id.)

The Ninth Circuit has explained that:

> While it can be slight, there still must be some evidence demonstrating the elements of the defense before an instruction must be given. The entrapment defense has two elements: "(1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime." *United States v. Barry,* 814 F.2d 1400, 1401 (9th Cir. 1987). We have held that "[a] defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing some inducement by a government agent *and* a lack of predisposition by the defendant." United States v. Rhodes, 713 F.2d 463, 467 (9th Cir. 1983); see also United States v. Busby, 780 F.2d 804, 806 (9th Cir. 1986) ("The trial court will instruct on entrapment only if the defendant presents some evidence of both elements of the entrapment defense.").

United States v. Spentz, 653 F.3d 815, 818 (9th Cir. 2011) (footnote omitted).

Here, Petitioner has put forward no evidence whatsoever that any government agent either encouraged or authorized Petitioner to enter into the murder conspiracy. To the contrary, the State introduced evidence at trial that officers specifically admonished Petitioner not to commit any crimes. (Doc. No. 32-13 PageID 3838–39.) Moreover, as the trial court observed, even "if there had been outrageous government misconduct in this case, which there was not, a normal law-abiding person would not resort to murder in an attempt to dominate and control prison gang activities." (Doc. No. 32-25 PageID 4849–50.) Petitioner's entrapment claim is without merit.

### F. Cumulative Error

Petitioner argues that each of the alleged errors discussed above, even if harmless in isolation, together rendered his trial unconstitutional. (Doc. No. 1 PageID 89.) See United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (explaining the cumulative error doctrine). However, "where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation." Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000). Because Petitioner has not identified any actual constitutional errors, there can be no cumulative error.

### G. Ineffective Assistance of Counsel

Finally, Petitioner argues that his trial and appellate lawyers were ineffective for failing to press the alleged errors discussed above. (Doc. No. 1 PageID 76–84.) Because none of Petitioner's claims identify actual errors, however, his lawyers were not ineffective for failing to press them. See, e.g., Sexton v. Cozner, 679 F.3d 1150, 1161 (9th Cir. 2012) (counsel was not ineffective "merely because he declined to raise meritless claims").

## II. Statute of Limitations

Although the Court concludes that Petitioner's claims fail on the merits, the Court also agrees with Respondent and the Report and Recommendation that the claims are all time-barred. AEDPA requires state prisoners to file federal habeas claims within one year after receiving an adverse judgment from a state court. 28 U.S.C. § 2244(d)(1). Relevant here, the one year limitation clock began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," id. § 2244(d)(1)(A), but was tolled during the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim [was] pending." Id. § 2244(d)(2). This tolling does not operate "from the time a final decision is issued on direct state appeal and the time the first state collateral challenged is filed because there is no case 'pending' during that interval." Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999). Neither does this tolling apply during the period a state habeas petition is pending if that petition is ultimately rejected as untimely. Pace v. Diguglielmo, 544 U.S. 408, 417 (2005).

Here, the California Supreme Court denied review of Petitioner's convictions on June 11, 2014, and his conviction became final 90 days later on September 10, 2014 when the time for filing a petition for certiorari expired. Petitioner did not submit the instant petition to prison officials to be filed until April 7, 2016—576 days later. During the intervening period, AEDPA's statute of limitations was tolled for 28 days from December 18, 2014 through January 14, 2015, while the trial court considered his state habeas petition. It was not tolled while the Court of Appeal and the California Supreme Court

considered Petitioner's claims, however, because the Court of Appeal rejected the petition as untimely, Pace, 544 U.S. at 417, and the Court must assume that the California Supreme Court rested its denial on the same basis. Wilson, 138 S. Ct. at 1192. Accordingly, Petitioner filed this action 183 days after AEDPA's statute of limitations expired.

Petitioner argues that AEDPA's statute of limitations should be equitably tolled because he and his jailhouse lawyer were transferred to different prisons while Petitioner was trying to put together his state habeas petitions, making coordination difficult. (Doc. No. 27 PageID 1658–59.) Equitable tolling of AEDPA's statute of limitations is available only when a petitioner shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace, 544 U.S. at 418). The circumstances identified by Petitioner are not "extraordinary," and do not justify equitable tolling. See, e.g., Chaffer v. Prosper, 592 F.3d 1046, 1049 (9th Cir. 2010) (an inmate's "reliance on helpers who were transferred or too busy to attend to his petitions" does not justify equitable tolling because "these circumstances are hardly extraordinary given the vicissitudes of prison life"); Lindsey v. Davis, No. EDCV 17–956–BRO (GJS), 2017 WL 5198155, at *9 (C.D. Cal. Sept. 22, 2017) ("Reliance on the assistance of other inmates cannot meet the extraordinary circumstances requirement, because this is a common incident of prison life."), report and recommendation adopted 2017 WL 5198157 (C.D. Cal. Nov. 8, 2017); Amavisca v. Scribner, No. CV F 05-1632 SMS HC, 2006 WL 3635461, at *5 (E.D. Cal. Dec. 8, 2006) (no equitable tolling where petitioner claimed "that prison transfers interfered with his obtaining assistance for a jailhouse lawyer").[1]

---

[1] The Federal Magistrates Act provides that: "Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "The statute makes it clear that the district judge must review the magistrate judge's findings and recommendations the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise." United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original); see also Peretz v. United States, 501 U.S. 923, 939 (1991) ("[T]o the extent 'de

## Conclusion

For the foregoing reasons, the Court concludes that each of Petitioner's claims fail on the merits under de novo review, and are otherwise time-barred. The Court accordingly adopts the Report and Recommendation as supplemented by the reasoning in this Order, dismisses the petition, and directs the Clerk to enter judgment in favor of Respondent.

**IT IS SO ORDERED.**

DATED: May 21, 2018

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties.'" (quoting United States v. Peacock, 761 F.2d 1313, 1318 (9th Cir. 1985) (Kennedy, J.))). Here, Petitioner has failed to file any written objections to the Report and Recommendation, and has thus waived his right to review. Although the Court has exercised its discretion to review Petitioner's claims de novo, the Court does not excuse Petitioner's waiver.